F I L E D
United States Court of Appeals
Tenth Circuit

NOV 4 2004

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ELIZABETH GAITHER,

       Plaintiff-Appellant,

    v.

AETNA LIFE INSURANCE
COMPANY and PHARMACIA
CORPORATION,

       Defendants-Appellees.

No. 03-7029

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 01-CV-410-P)**

Will K. Wright, Jr. (Gentner F. Drummond with him on the briefs), The Drummond Law Firm, Tulsa, Oklahoma, for Plaintiff-Appellant.

Mark D. Spencer (Amy D. White with him on the brief), McAfee & Taft, P.C., Oklahoma City, Oklahoma, for Defendant-Appellee Aetna Life Insurance Company.

Tamsin J. Newman (Joseph J. Costello with her on the brief), Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania, for Defendant-Appellee Pharmacia Corporation.

Before **MURPHY**, **HOLLOWAY**, and **McCONNELL**, Circuit Judges.

**McCONNELL** , Circuit Judge.

_____

In the summer of 1999, Donald B. Gaither was suspended from employment because his employer determined that his medical condition—his use of narcotic painkillers—made him unable to perform his job. At the same time, his employer's ERISA plan administrator denied him disability benefits because his medical condition did not make him unable to perform his job. The plan administrator defends on the essential ground that it did not know, and was under no obligation to find out, why Mr. Gaither lost his job.

Until September 1999, Mr. Gaither worked for Monsanto Corporation ("Monsanto") as a Utilities Team Leader in an Okmulgee, Oklahoma plant. [1] In late 1996, he was diagnosed with multiple myeloma, a cancer of the blood that affects the bone marrow. His long and ultimately unsuccessful battle against the disease required extended absences from his job, during which time Monsanto provided disability benefits to him pursuant to an employee benefits plan governed by ERISA. Mr. Gaither also took powerful prescription drugs to manage his pain, but he eventually attempted to wean himself from them in order

_____

[1]Technically, Mr. Gaither worked for a subsidiary corporation named Kelco, and in 2000, Monsanto merged with Pharmacia & Upjohn and changed its name to "Pharmacia Corporation." For simplicity, all references to the company will be to Monsanto.

to return to Monsanto, which insisted that the drugs impaired his judgment and made him unfit for his position.

After Mr. Gaither had been back at work for several months, Monsanto discovered evidence that Mr. Gaither was once again taking prescription painkillers. As a result, Monsanto personnel found Mr. Gaither temporarily unfit for his job and placed him on leave beginning on July 22, 1999, and continuing until he was terminated for unauthorized personal use of a company credit card on September 2nd of that year. Meanwhile, Aetna Life Insurance Company ("Aetna"), the company that administered Monsanto's disability plan, denied him benefits on the ground that there was "inadequate documentation of functional disability preventing the performance of the essential duties of [Mr. Gaither's] occupation . . . during the period from July 1999 through September." It apparently reached this conclusion without any awareness of Monsanto's contrary findings or inquiry into the reasons for Mr. Gaither's suspension.

The district court affirmed Aetna's decision, applying the "arbitrary and capricious" standard of review. On appeal Mr. Gaither argues that under the circumstances of his case, Aetna's failure to inquire about the reason Monsanto put him on leave rendered its decision arbitrary and capricious. He also argues that Monsanto had an obligation to inform Aetna of the grounds for his leave of

absence. We agree with Mr. Gaither and therefore reverse the judgment of the district court.

BACKGROUND

Mr. Gaither's problems began in October 1996 when he hurt his back playing golf. When that pain, along with pain from a previous rib injury, did not subside, Mr. Gaither saw a doctor. After several tests, he was diagnosed with multiple myeloma. In victims of that disease, the affected plasma cells (known as myeloma cells) multiply and gather in the bone marrow. Typically, they accumulate in the cavities of multiple bones, where they eventually cause numerous small lesions, often resulting in fractures, and weakness in the bone structure. As in Mr. Gaither's case, a common early symptom of the disease is pain in the ribs or lower back caused by such lesions and fractures.

As a Monsanto employee, Mr. Gaither was eligible for disability benefits under the Monsanto Disability Income Plan ("the Plan"), Appellees' Supp. App. 48–72, an ERISA plan partially administered by Aetna. Under the Plan, for the first two years of disability, a claimant is eligible for benefits if he is "not able, solely because of disease or injury, to perform the material duties of [his] *own occupation* ." Group Coverage Plan Booklet 3, App. Vol. II. 561 (emphasis added). After two years, the requirements tighten, and the claimant becomes

eligible only if, as a result of the disease or injury, he becomes disabled from "any reasonable occupation."   *Id*.

After talking with Mr. Gaither and his supervisor at work, and after confirming his condition with his doctors, Aetna certified Mr. Gaither's disability through mid-July of the following year while he underwent chemotherapy. He was also in and out of the hospital trying to wean himself from prescription pain medications during that time. Under Mr. Gaither's disability plan, during the first six months of that leave, his benefits were 100% of his normal salary; after that point he entered a Long-Term Disability status and received only 65% of his salary.

Feeling mounting pressure to provide for his family of four children, Mr. Gaither returned to work in July 1997. Despite his earnest desire to return to work, Mr. Gaither's recovery was far from complete. At the end of September, Monsanto informed Aetna that in Mr. Gaither's first two months back on the job, he had missed more than a month of work and occasionally had trouble completing his twelve-hour shifts when he did show up. When questioned, Mr. Gaither stated that he had missed those days because of pain. Aetna refused to certify Mr. Gaither's disability for that period, although the case file notes explaining why appear to be missing from our copy of the record.

The next development in Mr. Gaither's case came in April 1998, when Susan Shean, Health Services Supervisor at Monsanto, contacted Aetna because Mr. Gaither had apparently stopped working again two months earlier. She stated that this was a difficult case and that she would handle it directly. Ms. Shean tracked down Mr. Gaither's new oncologist, Dr. Brunk, and forwarded his medical records to Aetna. Those records showed that his multiple myeloma condition was improving. Dr. Brunk's office also indicated that the "biggest prob[lem was] back pain and gross fatigue," and reported that Mr. Gaither's dosage of Oxycontin was being increased as of April 23. That same day, Mr. Gaither had a three-way phone conversation with Ms. Shean and Aetna's case worker. He expressed a desire to return to work immediately (rather than returning to 65% disability pay) and claimed that although he had just had his Oxycontin prescription increased, he was not taking the drug. Ms. Shean, on the other hand, noted that he had not managed to fulfill his job duties consistently, and questioned whether it was appropriate for him to resume working. The upshot of the conversation was that Ms. Shean would send Dr. Brunk a description of Mr. Gaither's job specifications and ask for his evaluation of Mr. Gaither's ability to return to work with or without restrictions. On May 6, 1998, Ms. Shean wrote the following in her request to Dr. Brunk:

> The Team Leader's guidance, judgments, and decision
> making abilities are crucial to the safety of the operation

and the personnel on his shift. Our concerns about his ability to function safely are heightened by the knowledge that he may be using the analgesic Oxycontin at work, in either sustained release or immediate release formulations.

Letter from E. Susan Shean to Fred Brunk, M.D. (May 6, 1998), App. Vol. II 402.

By May 11, Ms. Shean had determined which days Mr. Gaither missed, and based on her report, Aetna retroactively certified Mr. Gaither's disability for eight days in September 1997, six days in January 1998, and from February 10, 1998 until May 15. Ms. Shean stated, however, that Mr. Gaither would not be allowed to return to work until she had received more information from his treating physicians and he had obtained clearance from Monsanto's medical department. Mr. Gaither's physicians were somewhat slow to respond, and even when Dr. Brunk indicated that he thought Mr. Gaither could return to work, Ms. Shean remained worried that he had not recognized the dangers involved in letting Mr. Gaither perform his duties while on pain medications. On several occasions, Aetna extended Mr. Gaither's disability certification based solely on Monsanto's continuing concerns about safety and refusal to let Mr. Gaither return to his job.

Finally, on June 16, 1998, Aetna successfully reached Dr. Sorenson, Mr. Gaither's pain specialist, who was unsure about Mr. Gaither's situation in particular but noted that his patients could usually perform at their jobs without any problems. Because of this uncertainty, a reviewing Aetna physician ordered

an independent medical evaluation from a doctor in occupational medicine. On July 9, 1998, that evaluation was performed by Dr. William Gillock. He concluded that until Mr. Gaither stopped taking narcotic pain medications, he should refrain from using or supervising hazardous machinery, using company vehicles, and working on unguarded elevations.

After consulting with Mr. Gaither's supervisor, Ms. Shean reported to Aetna that Monsanto could not accommodate Dr. Gillock's restrictions. As a result, Aetna's case worker transferred Mr. Gaither's case to a rehabilitation specialist who could help Mr. Gaither retrain for other occupations.

Threatened with the loss of his position and the need to seek new employment, Mr. Gaither spoke with Ms. Shean, assuring her that he was "pain free and in a program to withdraw[]" from his pain medications. She therefore requested that Aetna continue to certify Mr. Gaither's disability and delay retraining until September 1998, when Mr. Gaither was scheduled to finish his drug weaning program. However, when Aetna's onsite representatives finally tracked Mr. Gaither down in September, he had only just started reducing his dosage on September 24. Although he claimed he would be ready to return to work in another five weeks, his wife disagreed, stating that he would always be limited in his ability to work even though he would "say anything so that he can [return to work] due to his family and [four] children."

Around the beginning of November, when Mr. Gaither and his wife met with Aetna's onsite representatives, he had made some progress in reducing his Oxycontin dosage, although there had been "a lot of pain" and he had been very "jumpy" and unable to control his temper during the first three weeks of withdrawal. Mr. Gaither's biggest problem at that point was his lack of stamina, which allowed him to do no more than thirty minutes of yard work at a time. After talking with Dr. Sorenson about Mr. Gaither's progress weaning himself from Oxycontin, Aetna's rehabilitation specialist and Ms. Shean agreed on November 4 that Mr. Gaither could gradually return to work while participating in a work hardening program to build his stamina. On November 16, however, Ms. Shean talked with Aetna again, explaining that Mr. Gaither had fallen behind his drug weaning schedule and that his pain management clinic reported that Mr. Gaither was not as pain-free as he claimed to be. Ms. Shean stated that "the plant manager in Ok[lahoma] will not allow [Mr. Gaither] to return to work with any drugs; therefore, [he] must be totally detoxed from the medications." Mr. Gaither completed his drug weaning program and underwent another independent medical evaluation by Dr. Gillock on January 9, 1999. Dr. Gillock approved him to work without restrictions (subject to the caveat that if Mr. Gaither began taking narcotic pain medications again, the old restrictions would need to be reinstated).

Mr. Gaither gradually resumed working, and was finally back to full-time work by February 7, 1999.

Mr. Gaither apparently continued to work for several months until the incidents that resulted in his leave of absence. As determined by Monsanto's internal investigation, the facts are these: On July 15, 1999, Mr. Gaither went to Okmulgee Memorial Hospital to be treated for chest pain resulting from a sneeze. The doctor gave him a shot of Demerol and a prescription for two to three days of Lortab. Two days later, early on a Saturday morning, Mr. Gaither returned to the hospital, complaining about an injury that happened when a wrench slipped, striking his sternum. Mr. Gaither received a shot of Demerol at 1:15 a.m., took a Lortab orally, and went to work on the swing shift. At work, he aggravated the injury to his sternum and left work without informing his supervisor. When questioned the following Monday about his disappearance, Mr. Gaither ultimately admitted to visiting the hospital and obtaining prescription medications. Mr. Gaither was placed on leave and sent for drug testing. In the meantime, he saw Dr. Sorenson for his sternum pain and received another prescription for Lortab. Then, on August 10, Mr. Gaither's drug test results confirmed the presence of "at least two narcotic pain killers." App. 91. In a letter dated August 27, 1999, Vera Daniel, the Oklahoma plant's human resources manager, recounted these events and concluded that "being under the influence of these medications rendered you

unfit for duty for your position as a Utilities Team Leader." *Id.* The letter also explained that because Mr. Gaither had broken his promise not to come to work under the influence of narcotics, he was to be placed on probation and receive a one-week disciplinary leave without pay. This letter was never delivered, however, because in early September 1999, Mr. Gaither was terminated for incurring more than $2,000 of unauthorized personal expenses on his company credit card.

On August 11, 1999, Mr. Gaither called Aetna to begin processing his claim for disability pay. Two days later, Ms. Shean called about the case, and as a result of the discussion between Aetna's claims nurse and Ms. Shean, Ms. Shean said she would have Ms. Daniel call Aetna about the "disposition of this case." (At the time, Ms. Daniel was gathering detailed information about Mr. Gaither's drug use.) The next recorded action on the case was a call from Ms. Shean on September 20, directing Aetna to close the case because Mr. Gaither had been terminated. Apparently without any further consideration of Mr. Gaither's eligibility for benefits prior to his termination, Aetna closed the file. The record does not indicate whether Mr. Gaither was ever notified of this decision.

That might have been the end of the matter if Mr. Gaither had not written a letter to his plant manager, Mike Veltri, arguing that his lapse in ethical judgment was due to his medications, and begging him to "set aside" Mr. Gaither's

termination so that he could apply for long-term disability benefits. In December 1999, Ms. Daniel wrote back, telling Mr. Gaither that he was "eligible to apply for Total and Permanent Disability benefits for all occupations," and that he should call a Monsanto disability representative in Saint Louis (Kim Paulson) to start his application process. App. 65. Ms. Daniel also explained that Mr. Gaither and his physician would have to work closely with Aetna, which was entirely in charge of the process.

On December 7, Ms. Paulson contacted Aetna and explained that it would need to assess the medical necessity for Mr. Gaither's leave, and also whether Mr. Gaither was totally and permanently disabled as of his termination. The caseworker assigned to handle Mr. Gaither's claim, Bobbie DeNucci, attempted to reach Ms. Shean that same day, and Ms. Shean called back three days later. According to Aetna's records, Ms. Shean had told Mr. Gaither that he would need to contact his physicians and have them supply clinical information to Aetna so it could determine whether he was disabled while on leave. It was agreed that Ms. Shean would contact Mr. Gaither again to stress that he would have to contact his doctors because Aetna did not know their numbers. On December 13, Ms. Shean explained to Mr. Gaither that he should choose one of his doctors who would "best represent his case for consideration of total disability from his usual and customary occupation," and give that doctor's name to Aetna for follow-up. In an

internal e-mail sent the next day, Monsanto's disability representative corrected Ms. Shean, stating that Mr. Gaither must be found disabled from "any occupation."

Mr. Gaither did not provide any information for some time, so Ms. DeNucci called him on January 6, 2000. He called back, with the "assistance of his father," on January 10, and provided the names and telephone numbers of Drs. Jin, Brunk, and Sorenson. His wife was to call their offices and authorize the release of medical information to Aetna. The next day, Ms. DeNucci called Dr. Jin's office, which had received the release form, and requested his records. The administrative record, which generally documents all of Aetna's communications about the case, shows no attempt to contact either of the other two physicians.

On February 10, the record reports that "numerous calls have been received from father to inquire if r[e]cords have been received." Mr. Gaither's father was told that Dr. Jin's office notes and answers to an Aetna questionnaire were still missing. He said he would contact Dr. Jin's office again. Finally, on February 15, Dr. Jin's materials were received, and Mr. Gaither's file went to Dr. Bonner for review. In his review, Dr. Bonner stated that "the issue I must decide is whether Mr. Gaither was medically disabled for *any work* during [the] period of time" of Mr. Gaither's leave and subsequent termination. App. Vol. II 364, Appellees' Supp. App. 237 (emphasis added). After reviewing Dr. Jin's

psychiatric notes, Dr. Bonner concluded that "[t]he medical records provided DO NOT indicate that Mr. Gaither was unable to continue working as of the beginning of September and thus was not disabled for any occupation at that time." App. Vol. II 365, Appellees' Supp. App. 238.

Aetna's letter explaining its decision was internally inconsistent. It quoted part of the Plan's definition of disability, applicable during the first two years of disability, which provides that a claimant is eligible for benefits when he is "not able, solely because of disease or injury, to perform the material duties of [his] own occupation" and told Mr. Gaither that he was denied "due to definition of disability." App. 114. It elaborated:

> Medical Records provided do not indicate that you were unable to work as of the beginning of September and thus were not disabled for *any occupation* at the time.
>     In view of the above, Aetna is upholding our termination decision of your claim for disability benefits on the basis that you are not totally disabled from *your own occupation* based [on] the medical information provided.

*Id.* (emphasis added). Ms. DeNucci also talked with Mr. Gaither's father by telephone, explaining that he could appeal and that he would need to obtain detailed information from all of Mr. Gaither's attending physicians explaining the rationale for "total disability." Mr. Gaither's father wrote a letter explaining about his son's reliance on painkillers, enclosing notes of treatment from Dr. Brunk and hospital records showing Dr. Sorenson as the attending doctor. He

also included a copy of Mr. Gaither's letter to Mike Veltri indicating that his medications had caused his lapse in judgment. On second-level review, Dr. Hellman determined that Mr. Gaither's multiple myeloma was stable and therefore found "inadequate documentation of functional disability preventing the performance of the essential duties of [Mr. Gaither's] occupation . . . during the period from July 1999 through September." App. 117. Dr. Hellman's determination made no mention of drug use or dependency, which was the basis for his inability to perform his job.

Mr. Gaither appealed that determination in district court. The district court upheld the decision as reasonable. [2]

DISCUSSION

Mr. Gaither is requesting benefits under the Employee Retirement Security Act § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). That section allows a beneficiary of an ERISA plan to bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Mr. Gaither argues that he was discharged on account of a medical condition, namely his use of narcotic pain killers, which rendered him unable to work and hence disabled under the terms of

---

[2]Mr. Gaither is now deceased. We grant the motion to substitute Elizabeth Gaither as plaintiff-appellant.

the Plan.  He further claims that to the extent this was not evident from the record, Aetna was under an obligation to inquire into, and Monsanto to provide documentation regarding, the reason for his suspension from employment. [3] Appellees Aetna and Monsanto primarily argue that the record contains no evidence establishing that Mr. Gaither's medical condition—use of pain killers—rendered him unable to work, and Aetna was under no obligation to request, nor Monsanto to provide, documentation supporting his suspension.

---

[3]The dissent maintains that Mr. Gaither failed to make these arguments and thus that our decision "perpetrates a great injustice" against the defendants.  See Dissenting Opinion of Murphy, J., at 1.  We do not agree.  In his appellate briefs, Mr. Gaither argued explicitly that "Aetna's decision was uninformed and arbitrary because it failed to fairly and fully develop the administrative record, failed to make reasonable inquiry into the reasons why Gaither was on a leave of absence . . ."  Appellant's Br. 9; see also *id.* at 12-15, 17.  In district court, he argued that "Aetna, as expert administrator and fiduciary of the Plan, should not have rendered its decision until all the employment records relating to Gaither [including the reason for his termination] were submitted to it."  App. 62. That is the basis on which we have decided the case.  According to Mr. Gaither, if Aetna had complied with its obligation to develop the record in accordance with the Plan, it would have uncovered substantial evidence that he was dependent on pain-killing narcotics and that this was the cause of his termination. We see no "great injustice" in remanding this case to the pension plan administrator to consider whether that drug use constituted a disability, which has been his claim all along.  While we are hesitant to use the term "great injustice," which might be thought hyperbolic, what concerns us is the possibility that a worker suspended from employment on account of a disability may have been denied disability benefits because the plan administrator failed to take reasonable steps to determine the reason for his suspension.  Contrary to the dissent, Aetna has had full opportunity to address that argument, and has done so in its briefs in this Court.

Before we consider the merits of Mr. Gaither's claim and the companies' defense, however, we must pause to consider the appropriate standard of review.

## I

When an ERISA plan grants a plan administrator (or its delegate) discretion in administering the plan, we will uphold its decisions unless they are arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Monsanto's Disability Income Plan clearly grants this kind of discretion:

> The Plan Administrator (or such other party to whom duties of administration have been delegated, including without limitation, an Administrative Services Provider) shall perform its duties of administration as it determines in its sole discretion . . . . In particular, the interpretation of all Plan provisions, and the determination of whether an Employee is entitled to any benefit pursuant to the terms of the Plan, shall be exercised by the Plan Administrator (or other party referred to above) in its sole discretion.

Monsanto Disability Income Plan § 21.3, Appellees' Supp. App. 68. Because Aetna is an administrative services provider with the delegated authority to process claims under the Plan, its determinations are subject to review under the highly deferential "arbitrary and capricious" standard.

The next question is whether to apply the "pure" arbitrary and capricious standard or some less deferential version. Because Monsanto's Plan is self-funded, Aetna has no direct financial interest in rejecting claims that would cause us to lessen our deference. *See Fought v. Unum Life Ins. Co.*, 379 F.3d 997, 1003

(10th Cir. 2004). Although our precedents suggest another reason for lessening deference—when "a serious procedural irregularity exists, and the plan administrator has denied coverage," *id.* at 1006; *Caldwell v. Life Ins. Co.*, 287 F.3d 1276, 1282 (10th Cir. 2002); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999)—Mr. Gaither has not argued for an enhanced standard of review, and we therefore assume that the "arbitrary and capricious" standard applies.

II

Aetna and Monsanto cite numerous precedents of this Court establishing that because our review is not de novo, we cannot go beyond the administrative record. *See, e.g.*, *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992) ("In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision."); *Nance v. Sun Life Assur. Co.*, 294 F.3d 1264, 1269 (10th Cir. 2002); *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 823-24 (10th Cir. 1996). To drive the point home, they go on to cite three of our cases for the proposition that we must follow our own precedents, *Jennings v. Natrona County Detention Ctr.*, 175 F.3d 775, 780 n.3 (10th Cir. 1999); *Jones v. Runyon*, 91 F.3d 1398, 1400 n.1 (10th Cir. 1996); *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam), and still another case for the proposition that we must follow the precedent that requires us

to follow our own precedents, *see United States v. Gillis*, 942 F.2d 707, 711 (10th Cir. 1991). ("But," said the Tortoise to Achilles, "where is the precedent that says we must adhere to the precedent of adhering to the precedent of adhering to precedent?" [4])

For all of their emphasis, however, we do not think that restricting our consideration to the administrative record results in an easy victory for Aetna and Monsanto. That record establishes that even before he first returned to work in 1997, Mr. Gaither's difficulty weaning himself from narcotics required him to be in and out of the hospital; in 1998, the weaning process took four months longer than expected. Moreover, the record establishes that being drug-free was an essential requirement for Mr. Gaither's job. Even after his doctors thought his health was good enough to allow him to return to work in 1998, Monsanto maintained that he was unfit to resume his duties until he was no longer taking any narcotic pain medications. Dr. Gillock's independent evaluation confirmed Monsanto's judgment by finding that Mr. Gaither should not be allowed to drive or operate or supervise heavy machinery so long as he was under the influence of narcotic pain medications.

---

[4]*See* Lewis Carroll, *What the Tortoise Said to Achilles*, 4 Mind 278-80 (1895), *available at* www.lewiscarroll.org/achilles.html.

In July 1998, at the urging of Monsanto, Aetna certified Mr. Gaither as having an ongoing "own occupation" disability on this basis. In January 1999, when Dr. Gillock lifted Mr. Gaither's restrictions, he did so with the proviso that "if [Mr. Gaither] subsequently requires narcotic pain medication, he will require reinstitution of the previously placed recommendations." App. Vol. II 144. Having agreed with Dr. Gillock once that narcotics rendered Mr. Gaither disabled and eligible for long-term disability benefits under the "own occupation" standard, Aetna would need some compelling rationale for disagreeing about the effect of a return to those drugs. Absent such a rationale, it would have been arbitrary and capricious for Aetna to deny Mr. Gaither's disability had it known that he was back on narcotics.

Aetna's reviewers provided no such rationale, and indeed hardly seemed aware that drug use was the issue. Dr. Bonner, for instance, noted that Mr. Gaither "had a difficult time weaning off narcotic pain meds," App. Vol. II 364, Appellees' Supp. App. 237, but then went on to find that "[a]ny change in work status appears to be related to his behavior at work and not a change in his medical condition." App. Vol. II 365, Appellees' Supp. App. 238. His conclusion was based almost entirely on notes from Mr. Gaither's psychiatrist, recording the unsurprising observation that with increased doses of Seroquel and then Valium, Mr. Gaither was more relaxed and sleeping better. App. Vol. II

364-65, Appellees' Supp. App. 237-38. Similarly, Dr. Hellman found on the basis of those notes that "the claimant[']s condition appears to be better during the period 7/99 onward than at any time prior to that." App. Vol. II 380. Their focus on whether Mr. Gaither had a psychologically disabling anxiety disorder apparently led them to overlook the signs of a potential drug use problem.

Given that Mr. Gaither was previously found disabled for his job because the pain medications might cloud his judgment, it is strange that the reviewers saw the prescription of Valium to help him relax, and its apparent effectiveness, as an unequivocally positive development. This suggests that they simply had not come to grips with the true nature of Mr. Gaither's job requirements. Indeed, the denial letters described Mr. Gaither's job as a "medium demand position that required you to stand, walk, climb, reach and lift up to fifty pounds," without any reference to his job's requirement that he abstain from narcotics. App. 116. At least in Dr. Bonner's case, it is not surprising that this was overlooked, as it appears that he erroneously evaluated Mr. Gaither's claim based on whether he was disabled for *any* occupation. *See* App. Vol. II 364-65, Appellees' Supp. App. 237-38.

Had they looked more closely, Aetna's reviewing physicians would have found several indications that Mr. Gaither was again taking narcotics during the

relevant time period. First and foremost, Mr. Gaither's father's response to

Aetna's initial rejection stated as follows:

> [Bruce] has contracted an incurable cancer known as multiple myeloma. Its effect is centered in his bone structure and produces pain to an extraordinary level and extent. In order to counteract this pain, he is required to take medication every day of his life and will continue to do so as long as he lives. It was the effect of this medication that caused his behavioral patterns to change so dramatically and which caused his termination in 1999.

Letter from Donald R. Gaither to Aetna Life Insurance Co. (Apr. 14, 2000), App.

Vol. II 31. In addition to this letter, Mr. Gaither's administrative appeal also

included supplemental materials, including a letter from Mr. Gaither to his plant

manager, Mike Veltri, which stated,

> I have visited with each of my three primary doctors (Pain, Oncology, and Psychiatric therapy) and have received their assurance that in their respective professional opinions the medication that I am required to take would severely impair my judgement capabilities . . . .
> . . . My medication has caused me to do things that 2 years or more ago I would not have considered, much less done.

Letter from Bruce Gaither to Mike Veltri (Oct. 29, 1999), App. Vol. II 481.

The record also contains medical records from Mr. Gaither's oncologist,

Dr. Brunk, noting that Mr. Gaither was seen on July 22, 1999, when he was in

considerable pain because of an injury to his sternum. A whole-body bone scan

performed a week later, which listed Dr. Sorenson, a pain specialist, as the attending doctor, showed "abnormal intense uptake" in the region of the sternum, which was attributed to a "fracture versus less likely myelomatous involvement." While a CT scan did not confirm the fracture, it was taken at one-centimeter intervals and thus might have missed the relevant spot. Both the CT scan and the bone scan also confirmed the continued presence of multiple myeloma's characteristic lesions in Mr. Gaither's spine. During that July 29th visit, Mr. Gaither was diagnosed with "precordial pain" (i.e., chest pain) and "mult myeloma, no remiss." App. Vol. II 454.

Thus, while the administrative record may not have contained conclusive proof of ongoing narcotic drug use, Aetna had more than enough evidence to alert it to the possibility that during the relevant time period, Mr. Gaither was using narcotic pain medication; that he had a medical justification for doing so (both the new painful injury to the sternum and the older lesions in his spine); and that any such drug use rendered him unfit for his job according to Monsanto, Dr. Gillock, and its own prior determination. Moreover, because the letter from Mr. Gaither's father to Aetna states that Mr. Gaither's drug use resulted in his termination, it put Aetna on notice both that this drug use preceded the termination and that the reasons for Mr. Gaither's leave of absence may have been connected to his drug use.

## III

We think the signs in the record were sufficient to alert Aetna to the *possibility* of a narcotics relapse. Nevertheless, Aetna argues that its decision must be upheld because the record did not contain sufficient documentation to *prove* that disability (or any other). Mr. Gaither responds that, regardless of any shortcomings in the administrative record, Aetna acted arbitrarily and capriciously by denying his claim without obtaining more information first, and in particular without asking Monsanto about the circumstances surrounding Mr. Gaither's leave of absence. Aetna, on the other hand, maintains that the obligation to gather evidence in support of his claim is Mr. Gaither's alone.

Aetna draws support for its position from cases like *Sandoval*, where we wrote:

> If a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of the administrator's failure to consider this evidence. [A participant] is not entitled to a second chance to prove his disability.

*Sandoval*, 967 F.2d at 381; *see also Nance*, 294 F.3d at 1269. This is an accurate statement of the general duties imposed by ERISA on all plan administrators: nothing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists. However, in enacting ERISA, Congress purposely decided not to

-24-

erect a single regulatory edifice for the handling of benefits claims. Instead, it left employers considerable discretion to fashion private benefit plans tailored to their own (and their employees') needs. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003); *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Thus, it is necessary to look not just to the minimum standards of ERISA but also to the terms of the plan itself. *See, e.g.*, *Toland v. McCarthy*, 499 F. Supp. 1183, 1190 (D. Mass. 1980) (finding the denial of benefits arbitrary and capricious in part because the administrator had not checked its employment data with the employer, as the plan required).

Aetna cites in its favor section 17.1 of the Plan, which reads:

> Any Employee claiming benefits under this Plan shall provide sufficient medical evidence to the Administrative Services Provider and/or submit to such medical examination as might be requested by the Administrative Services Provider to determine whether he is eligible to receive the various disability benefits under this Plan. An Employee with a Long-Term Disability may be requested to submit to a medical examination as often as determined by the Administrative Services Provider to determine if he is eligible to continue to receive Long-Term Disability Benefits. If such Employee refuses or fails to provide sufficient medical evidence requested by the Administrative Services Provider, including but not limited to a medical examination, he shall cease to be eligible for Disability Benefits for the period of such refusal or failure.

Appellees' Supp. App. 65. However, while this provision of the Plan does suggest that the claimant has a duty to provide relevant evidence, it also states that "[t]he medical evidence to be furnished to the Administrative Services Provider shall consist of such information as the Administrative Services Provider deems necessary." *Id.* Moreover, section 17.1's penalty of ineligibility applies not to any failure to present evidence, but only to a failure to present "sufficient medical evidence *requested by the Administrative Services Provider*." *Id.* (emphasis added). These provisions do not establish an adversarial process in which the claimant is responsible to decide what evidence would be sufficient to prove his claim; rather, they give Aetna a great deal of discretion to determine what kinds of evidence it needs to determine a claim's validity, and they require claimants to cooperate with Aetna's requests for information.

For his part, Mr. Gaither contends that under the Plan, Aetna has a categorical duty to obtain, and Monsanto has a corresponding duty to provide, Monsanto's records about the reason for any leave of absence. He bases this claim in the following text of the Plan:

> Each Employer shall furnish the Administrative Services
> Provider with such data and information as the
> Administrative Services Provider may deem necessary or
> desirable in order to administer the plan. The records of
> an Employer as to a[n] Employee's period or periods of
> employment, termination of employment and the reason
> therefor, leave of absence, and reemployment will be
> conclusive upon all persons unless determined by the

Administrative Services Provider's satisfaction to be incorrect. Employees also shall furnish the Administrative Services Provider with such evidence, data or information as the Administrative Services Provider considers necessary or desirable to administer the Plan.

Monsanto Disability Income Plan § 21.5, Appellee's Supp. App. 69-70.

According to Mr. Gaither, the fact that Monsanto's records about his leave of absence are supposed to be treated as "conclusive" warrants the inference that they must be provided to and considered by Aetna. Like Aetna's conclusion above, this interpretation of the Plan seems to stretch too far. Section 21.5 states that certain kinds of evidence, when provided, should be accorded a certain weight; it does not establish a categorical duty to provide that evidence. Indeed, as the first and last sentences of section 21.5 make clear, Monsanto's duty to provide evidence is no broader than Mr. Gaither's. Both are to provide "such data and information as the Administrative Services Provider may deem necessary or desirable in order to administer the plan." *Id.* The Plan thus requires both to cooperate with Aetna's requests for information, but it does not envision Aetna sitting back and taking no investigatory role, waiting for a completed record to be provided by Mr. Gaither.

Appellees contend, however, that the only "data and information" Aetna required from Monsanto was "periodic written reports to Aetna including employee eligibility and participation data." Appellees' Br. 46. Monsanto, they

-27-

argue, was to provide information to help in administering the Plan as a whole, but not information about specific disability claims. We are not sure this distinction makes sense; Monsanto's data about employees' eligibility and participation are obviously relevant not just to the Plan as a whole, but to particular claims by particular employees. Moreover, the fact that the Plan specifically mentions information about an employee's "termination and the reason therefor" establishes that information about an employer's reasons for relieving an employee from duty is sometimes "necessary and desirable in order to administer the plan." Monsanto Disability Income Plan § 21.5, Appellees' Supp. App. 70.

This interpretation of the Plan is consistent with Aetna's actual practices with respect to review of Mr. Gaither's claims. Typically, a new disability claim was called in not by Mr. Gaither but by someone at Monsanto, and the Aetna caseworkers would begin processing by speaking with Ms. Shean or someone else at Monsanto about the case. The caseworker would obtain phone numbers for Mr. Gaither's physicians either from Mr. Gaither or from Monsanto and then contact their offices directly to obtain the necessary medical information. When Ms. Shean kept Mr. Gaither on leave in July 1998 because of her concerns about whether it would be safe for Mr. Gaither to return to work while on drugs, Aetna extended Mr. Gaither's leave for some time based solely on those concerns and

allowed her to collect more information from Mr. Gaither's doctors on that score. In that instance, Aetna obviously deemed Monsanto's reasons for keeping Mr. Gaither on leave relevant to administering the Plan. When Ms. Shean's investigation proved inconclusive, Aetna still did not simply resolve the dispute one way or the other; rather, it ordered further medical examinations to help resolve the issue. Both in theory and practice, the Plan gave Aetna considerable discretion to gather evidence as needed, and allowed Aetna to request both medical and nonmedical information about the case from Monsanto.

In Mr. Gaither's case, his employer's insistence on its drug-free workplace policy made it just as necessary for him to stay off of narcotic painkillers as it was for him to stand, walk, or lift up to fifty pounds. As noted above, the record already suggested a history of relieving Mr. Gaither from duty when he was on drugs. Given the indications in the record of a drug problem, and Ms. Shean's suggestion in August 1999 that Ms. Daniels (the local human resources manager) would call with information relevant to the disposition of Mr. Gaither's claim for disability pay during his leave of absence, it was arbitrary and capricious for Aetna to dismiss his claim for disability without at least attempting to obtain information from Monsanto about the reasons for Mr. Gaither's leave of absence. This oversight was all the more serious given the apparent failure to contact Dr. Sorenson, whose number Mr. Gaither provided and who might have been able to

provide at least some of the same information.  A denial of benefits must be supported by "substantial evidence."  *Sandoval*, 967 F.2d at 380 n.4.  But here, while Aetna's physicians had substantial evidence supporting their conclusion that Mr. Gaither was not psychologically disabled, they did not have substantial evidence about the extent or effects of his uncontroverted use of painkillers, another independent ground for disability presented in the record and specifically raised in Mr. Gaither's administrative appeal.  Aetna rejected that claim without a substantial basis for doing so, without following up on obvious leads, and apparently without specifically considering the claim at all. [5]

IV

Aetna complains that it cannot be required to "discover and scour every single one of the Company's records" that pertain "to a particular employee that has submitted a claim for benefits."  Appellees' Br. 40, 47.  We agree, and we do not announce such a sweeping principle.  *See Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 298 (5th Cir. 1999) (en banc) (refusing to impose a rule—even on

---

[5]Aetna points out that some of our cases suggest that a failure to gather evidence does not result in outright reversal but only decreases the amount of deference it should receive. *See Caldwell*, 287 F.3d at 1282.  That may well be the case when the plan administrator has reviewed a substantial amount of other evidence on a particular claim, so that despite the failure to investigate, the overall decision could still be within the bounds of reason.  But here, the failure to investigate left no adequate grounds for rejecting the narcotics-based disability claim, and therefore the overall decision was arbitrary and capricious.

conflicted administrators—that would place "the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to it, or which may be more readily available to the claimant"). Nor do we suggest that the administrator must pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other. *See LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir.1984).

Rather, we assert the narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory. *See Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463-64 (9th Cir.1997) (finding Aetna's denial of benefits arbitrary and capricious because, despite a straightforward explanation of the basis of the claim, Aetna did not ask for confirmatory evidence "easily obtainable" from the plaintiff's dentists); *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998) (finding that the denial of benefits was arbitrary and capricious because the claims processor, though "under a duty to make a reasonable inquiry" about the employee's skills and ability to work in other similarly paying jobs, determined that she "could

perform any clerical job in the marketplace simply because she was not highly paid or highly skilled"); *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1161 (8th Cir. 1998) (finding that when a beneficiary was diagnosed with scleroderma several months after leaving her job, it was improper for the administrator to deny benefits merely because, as of her termination date, no doctor had found her disabled; instead, it should have had a scleroderma expert review her earlier symptoms to determine when the disability started).

Aetna's position seems to be that as a plan fiduciary, it plays a role like that of a judge in a purely adversarial proceeding, where the parties bear almost all of the responsibility for compiling the record, and the judge bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim. The authority just cited suggests that Aetna has the wrong model. Indeed, one purpose of ERISA was "to provide a nonadversarial method of claims settlement." *Sandoval*, 967 F.2d at 382. In *Gilbertson v. Allied Signal, Inc.*, we explained what this nonadversarial process should look like:

> [ERISA and its implementing regulations require] a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied . . . the reason for the denial must be stated in reasonably clear language, . . . [and] *if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it*. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters.

-32-

328 F.3d 625, 635 (10th Cir. 2003) (emphasis added) (quoting *Booton*, 110 F.3d at 1463).

While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own.[6] An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter. *See Toland*, 499 F. Supp. at 1193 (relying on analogous principles governing judicial review of administrative

---

[6]Aetna cites *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985), for the proposition that its "fiduciary duties inure to the plan *as a whole* and not to Gaither individually." Appellees' Br. 39. While that case does state that "the principal statutory duties imposed on the trustees relate to the proper management, administration, and investment of fund assets," *Russell*, 473 U.S. at 142, it was decided on the narrow ground that the only remedy provided by the specific provision of ERISA at issue, 29 U.S.C. § 1109(a), is that the fiduciary "shall be personally liable to make good *to such plan* any losses" resulting from breaching its fiduciary duties. *Russell*, 473 U.S. at 140. Thus, *Russell* held merely that § 1109(a) did not provide a remedy for individual beneficiaries. *Accord Walter v. Int'l Ass'n of Machinists Pension Fund*, 949 F.2d 310, 317 (10th Cir. 1991). Since then, the Supreme Court has decisively rejected the claim that "Congress intended ERISA's fiduciary standards to protect only the financial integrity of the plan, not individual beneficiaries." *Varity Corp. v. Howe*, 516 U.S. 489, 507-15 (1996). Even in *Russell*, Justice Brennan's concurrence criticized the language cited by Aetna as misleading dicta. *See Russell*, 473 U.S. at 152-54 (Brennan, J., concurring in the judgment). Both Justice Brennan's concurrence and the Court's opinion in *Howe* make it clear that although a fiduciary must be impartial among the various beneficiaries, it still owes fiduciary duties to each individual beneficiary. *See id.*; *Howe*, 516 U.S. at 514.

agency decisions).  Fundamentally, what was missing in Mr. Gaither's case was a real response to his claim to be disabled because of narcotics use. [7]

V

By stressing Mr. Gaither's own responsibility to provide information relevant to his disability, Aetna hints at an "unclean hands" argument: regardless of whether it should have obtained more information from Monsanto, Mr. Gaither's claim should fail because he also had knowledge of the reasons for his leave of absence and did not choose to report even the information he had.  We are not sure that Aetna can use Mr. Gaither's independent shortcomings to avoid its own fiduciary obligation to reasonably exercise its powers under the Plan.  In any event, the way in which Mr. Gaither's claim was handled convinces us that any failure to provide evidence about his drug use was as much Aetna and Monsanto's fault as his own.  Aetna altogether failed to evaluate Mr. Gaither's claim the first time it was raised.  Then, when Mr. Gaither received special leave to apply for disability benefits, Aetna gave him conflicting information about the

---

[7]We do not mean to make any general criticism of Aetna's process for handling claims.  Indeed, throughout the course of Mr. Gaither's illness previous to the claim at issue here, Aetna was quite conscientious in following up with Mr. Gaither, his physicians, and Monsanto when more information was needed.

-34-

standard that would apply to his claim. Although subsequent communications mentioned the proper inquiry (whether he was disabled for his own occupation), the original letter allowing him to apply for benefits stated that he was applying for "Total and Permanent Disability benefits for all occupations." App. 65. The letter explaining his claim rejection compounded this confusion, defining disability relative to the employee's "own occupation," but saying that Dr. Bonner had rejected the claim because there was not evidence that Mr. Gaither was "disabled for any occupation." App. 114. It then apparently merged the "total and permanent disability" standard with the "own occupation" standard, concluding that Mr. Gaither was "not totally disabled from [his] own occupation." Aetna's references to the "any occupation" standard were materially misleading because medically necessary Lortab use presumably would not disqualify Mr. Gaither for any occupation.

Similarly, although some case notes suggest that Mr. Gaither was informed orally that the time period in question began in July 1999, the original letter allowing him to apply did not specify dates, and his denial letter only stated that he was not disabled as of September 2, 1999. Thus, even when Ms. DeNucci told Mr. Gaither's father that he needed to submit documentation from all of Mr. Gaither's physicians, this did not give Mr. Gaither fair warning that he needed to provide evidence of drug use during the earlier period.

-35-

These defects provide reason to reject Aetna's contention that, whatever its own failings, Mr. Gaither "is not entitled to a second chance to prove his disability." *Sandoval*, 967 F.3d at 381. It would be inequitable to rely solely on that ground for upholding Aetna's otherwise unreasonable decision given Aetna's own contribution to the defects in Mr. Gaither's *first* chance to prove his disability. We therefore maintain our decision that Aetna's resolution of Mr. Gaither's claim was arbitrary and capricious. [8] On remand, Aetna is required to reconsider its decision in light of the entire record, and to request and obtain additional documentation if necessary to determine Mr. Gaither's eligibility for disability benefits.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's finding that Aetna's decision was not arbitrary and capricious, and REMAND the case for further consideration consistent with this opinion.

---

[8] Mr. Gaither also urges us to hold that Monsanto itself had a duty to disclose its knowledge of his drug use to Aetna, either under the Plan or as an outgrowth of Monsanto's fiduciary duties. Although at least the Plan-based theory was raised below, the district court did not consider the issue. In light of our disposition of Mr. Gaither's claim that the denial of benefits was arbitrary and capricious, it is not necessary for this Court to address the issue of Monsanto's obligations, if any. Should this issue prove relevant on remand, the district court should address it.

<u>No. 03-7029, Gaither v. Aetna</u>

**Murphy, J.** , dissenting:

I respectfully dissent from the majority's determination that Aetna's decision was arbitrary and capricious. The basis for my dissent is that the argument upon which the majority decides the case has never been made by Mr. Gaither, who has appeared through counsel throughout this case. It is an argument made only by the majority and, as such, the majority's resolution of this appeal undermines the adversary process and perpetrates a great injustice against the defendant-appellee, Aetna, who has never had an opportunity to address the argument.

After Aetna denied his administrative appeal, Mr. Gaither filed a complaint in federal court against both Monsanto and Aetna wherein he alleged, *inter alia* , that the denial of benefits was "unreasonable and arbitrary and capricious." Aetna and Monsanto moved for judgment on this claim, asserting that the district court's review of the decision to deny benefits to Mr. Gaither was confined to the administrative record, that the arbitrary and capricious standard of review applied, and that Mr. Gaither bore the responsibility of bringing evidence in support of his claim for benefits to the attention of Aetna. Aetna and Monsanto then argued that Aetna's decision to deny benefits to Mr. Gaither was supported by "substantial evidence" in the administrative record and, thus, should be affirmed.

In his response to Aetna's motion, Mr. Gaither essentially conceded that the administrative record supported Aetna's decision to deny him benefits when he stated, "It is no wonder the Administrator found the record before him was inadequate. . . . All of the records evidencing Gaither's disability were in the hands of [Monsanto]." Instead, the crux of Mr. Gaither's argument was that his *employment records* allegedly contained information relevant to his disability claim and Monsanto breached its duty to provide those records to Aetna. Thus, Gaither argued, Aetna's decision was arbitrary and capricious because it was uninformed and failed to consider all the relevant facts even though such facts were not to be found in the administrative record. Mr. Gaither's argument was summarized in his brief to the district court as follows:

> It is clear [Monsanto] had a mandatory obligation to provide Aetna with all records relating to Gaither in order for the administrator to make an informed decision. [Monsanto] breached its obligation. Not to be let off the hook, Aetna, as expert administrator and fiduciary of the Plan, should not have rendered its decision until all the employment records relating to Gaither were submitted to it (i.e. [Monsanto's] records attached hereto).

The district court resolved each of the issues raised by the parties, concluding that its review was confined to the administrative record and that Mr. Gaither, not Monsanto, bore the responsibility to provide relevant information to Aetna. The court further concluded that Aetna's decision to deny benefits to Mr.

-2-

Gaither was not arbitrary and capricious because it was supported by substantial evidence.

In his appellate brief, Mr. Gaither argued that Monsanto had a duty under the terms of the Plan to furnish his employment records to Aetna, that Aetna unreasonably interpreted the Plan when it failed to compel Monsanto to produce his employment records, and that Aetna breached its duty under ERISA when it failed to obtain his employment records from Monsanto. Aetna and Monsanto responded to each of Mr. Gaither's arguments and further argued that Mr. Gaither was not entitled to relief in any event because the employment records he identified did not contain any information relevant to the determination of whether he was entitled to disability benefits pursuant to the Plan. The majority, however, fails to address any of these arguments, concluding instead that information in the administrative record placed Aetna on notice to inquire further into the circumstances of Mr. Gaither's leave of absence from the workplace, an argument never made by Mr. Gaither in the district court or in this court.

The majority contends that Mr. Gaither did raise this argument on appeal. Majority Opinion at 16 n.3. The single sentence in Mr. Gaither's opening brief to which the majority cites, however, appears in the section of the brief titled "Summary of the Argument." The Federal Rules of Appellate Procedure state that the summary of the argument section of an appellant's brief is simply "a succinct,

clear, and accurate statement of the arguments made in the body of the brief."
Fed. R. App. P. 28(a)(8). Statements made in this section of an appellant's brief
are decidedly *not* arguments. It is well-settled in this Circuit that an issue listed,
but not argued in the opening brief is waived. *Abercrombie v. City of Catoosa*,
896 F.2d 1228, 1231 (10th Cir. 1990). Here, the argument is not developed in the
argument section of Mr. Gaither's brief. *See* Fed. R. App. P. 28(a)(9) (stating
that the argument section of an appellant's brief " *must* contain . . . appellant's
contentions and the reasons for them, *with citations to the authorities and parts of
the record on which the appellant relies* ." (emphasis added)). Although the
majority references, without any summary or quotes, several pages from the
argument section of Mr. Gaither's opening brief, the arguments made on those
pages do not accurately mirror the theory on which the majority resolves this case,
and the pages referenced are completely devoid of any citations to the record.
The majority confuses the theory on which it resolves this case, *i.e.*, that
documents in Aetna's possession put it on notice to inquire further into the
reasons for Mr. Gaither's leave of absence, with the argument actually put
forward by Mr. Gaither, *i.e.*, that Aetna had a free-floating duty arising under
ERISA to obtain his employment records from Monsanto before rendering a
decision regarding his claim for disability benefits. The opaque and undeveloped
statements in Mr. Gaither's summary of the argument section and the additional

-4-

arguments made in his argument section wholly fail to raise or provide support for the former argument. Likewise, the statement the majority quotes from the brief Mr. Gaither filed in district court supports only Mr. Gaither's argument that Defendants had free-floating duties arising under ERISA to provide or obtain his employment records. Majority Opinion at 16 n.3. This is clear when the sentence quoted by the majority is read in context with its two prefatory sentences:

> It is clear [Monsanto] had a *mandatory obligation* to provide Aetna with all records relating to Gaither in order for the administrator to make an informed decision. [Monsanto] breached its obligation. Not to be let off the hook, Aetna as expert administrator and fiduciary of the Plan, should not have rendered its decision until all the employment records relating to Gaither were submitted to it (i.e., [Monsanto's] records attached hereto).

(emphasis added). Finally, the majority makes no effort to address Defendants' argument that even if the information in Mr. Gaither's employment records had been provided to Aetna, that information has no bearing on the question of whether Mr. Gaither suffered from a long-term disability as that term is defined in the Plan.

The impropriety of reversing the decision of a district court on the basis of an argument not made by an appellant is self-evident. First and foremost, the unfairness to the appellee is intolerable under our adversarial system. The Supreme Court has wisely cautioned against such judicial conduct that deprives a party of its right to be heard on an issue. *Singleton v. Wulff*, 428 U.S. 106, 119-

-5-

21 (1976) (reversing a merits determination made by a federal appellate court because the party against whom judgment was entered had no opportunity to present arguments on the merits). Even *pro se* litigants are not entitled to such assistance from this court. *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) ("Despite the liberal construction afforded pro se pleadings, the court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues."). An appellee should have the opportunity to respond to each and every argument made by the appellant in the district court and on appeal. The basis on which the majority resolves this appeal, however, takes the parties out of the process and substitutes this court as an advocate for Mr. Gaither, resolving this matter on grounds never before presented. The inequity is palpable.

The majority baldly states that "Aetna has had full opportunity to address that argument, and has done so in its briefs in this Court," but it fails to summarize Defendants' argument or indicate where in their response brief it is contained. Majority Opinion at 16 n.3. Although the majority belittles as "hyperbolic" the statement in this dissent that Defendants have suffered a "great injustice," its inability to identify Defendants' responsive argument undermines its criticism. *Id*.

This court has "repeatedly stated that a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory." *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993). There is an exception to this general rule when issues are raised for the first time on appeal and they involve "questions of law, the proper resolution of which [is] beyond reasonable doubt, and the failure to address the issues would result in a miscarriage of justice." *Petrini v. Howard*, 918 F.2d 1482, 1483 n.4 (10th Cir. 1990). This exception, of course, is not applicable here for two independent reasons: (1) the issue does not solely involve questions of law and (2) the argument has not been raised by appellant on appeal. *See Shoels v. Klebold*, 375 F.3d 1054, 1062 (10th Cir. 2004) (McConnell, J.) (concluding it "would be inappropriate to make an exception" and resolve the appeal in favor of appellant on the basis of an argument raised for the first time on appeal when there were unresolved factual questions).

Because the issue on which the majority resolves this case was not raised and decided below, factual materials were not submitted by the parties in the district court, thereby forcing the majority to engage in speculation to resolve this appeal. For example, Mr. Gaither has never asserted that one of his physicians, Dr. Sorenson, would have provided relevant information if he had been contacted by Aetna. Mr. Gaither's argument was instead confined to the assertion that

records in *Monsanto's* possession substantiated his claim for disability benefits. The majority, nevertheless, speculates that if Aetna had contacted Dr. Sorenson, he "*might* have been able to provide at least some of the same information" that was in Mr. Gaither's employment records. Majority Opinion at 29 (emphasis added). Quite aside from that taint of speculation, the argument that Dr. Sorenson could have provided information relevant to his claim for disability benefits is Mr. Gaither's to make, and it is decidedly not the function of this court to make that argument for him. *United States v. Abdenbi*, 361 F.3d 1282, 1290 (10th Cir. 2004) ("This court should neither raise *sua sponte* an argument not advanced by a party either before the district court or on appeal, nor then advocate a particular position and resolve the appeal based on that advocacy."). Further, it is Mr. Gaither's obligation to demonstrate in this appeal that any information in Dr. Sorenson's possession *is* relevant to the determination of his claim for benefits. Of course, Mr. Gaither has failed to do this because he wholly fails to argue that Aetna had any obligation to contact Dr. Sorenson. Because this court now makes the argument Mr. Gaither has failed to present, it must necessarily speculate what the evidence might have been.

Finally, this is not a situation where this court must decide whether to allow Mr. Gaither to raise an issue on appeal that he failed to raise before the district court. *See Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1386 (10th Cir.

1997) ("We will consider matters not raised or argued in the trial court only in the most unusual circumstances, which may include issues regarding jurisdiction and sovereign immunity, . . . instances where public interest is implicated, . . . or where manifest injustice would result." (quotations omitted)). Instead, the *majority* has created for Mr. Gaither an entirely new theory on appeal which has never been raised by Mr. Gaither either in the district court or on appeal. Because I find this practice both unjust and unprecedented, I respectfully dissent.