**Howard BOYD, Plaintiff,**

v.

**AETNA LIFE INSURANCE COMPANY, the Boeing Company Long Term Disability Plan, the Boeing Company Medical Plan, the Boeing Life Insurance Plan, and the Boeing Company Pension/Retirement Plan, Defendants.**

**No. EDCV 05–466–SGL.**

United States District Court, C.D. California.

June 28, 2006.

---

Corinne Chandler, Glenn R. Kantor, Kantor & Kantor, Northridge, CA, for Plaintiff.

Amber M. McGovern, Berger Kahn, Marina Del Rey, CA, Ronald K. Alberts, Berger Kahn, Los Angeles, CA, Lindley Paige Fraley, Payne and Fears, Irvine, CA, for Defendants.

## ORDER RE PLAINTIFF'S MOTION TO DETERMINE STANDARD OF REVIEW

LARSON, District Judge.

Howard Boyd has filed suit pursuant to 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), challenging the denial of his application for long-term disability ("LTD") benefits. Boyd brings this action against his employer, Boeing Company ("Boeing"), Boeing's long-term disability plan ("Plan"), and the Plan's claims administrator and insurer, Aetna Life Insurance Company ("Aetna").[1] Currently before

---

1. For reasons not apparent to the Court, Boyd has also sued Boeing's medical plan, life insurance plan, and pension/retirement plan even though he is not seeking nor claiming the denial of any benefits from those plans. Accordingly, the Court will confine its discussion to the denial of long-term disability benefits.

the Court is Boyd's Motion to Determine the Standard for Reviewing Aetna's denial of his application for long-term disability benefits. For the reasons set forth below, the Court concludes that the proper standard of review is *de novo*.

## I. FACTUAL BACKGROUND

Boyd worked for Boeing for thirty-eight years beginning as an hourly laborer and ending as a manager, a position he held for twenty-two years. (Administrative Record ("A.R.") at 636). In the latter position, Boyd supervised a team of workers in the tooling department and was responsible for reconciling historical records involved in the purchase of tools for government contracts, preparing records for government audits, and tracking the cost, purchase and disposition of tools used in military projects. (A.R. at 636).

Toward the end of his tenure with Boeing, Boyd experienced recurrent bouts of depression brought about by the death of his father, a falling out with his eldest son, and stressors created at work by a new supervisor. (A.R. at 637). With respect to work stressors and without delving too deeply into details, Boyd complained that his new supervisor had instituted policies that were against corporate practice and that breached federal regulations. When he complained about the same to management and his complaints were sustained, the supervisor retaliated by disparaging him to those he supervised in the tooling records department and taking actions in Boyd's department without first consulting with him. Shortly thereafter, Boyd was placed on temporary total disability on account of depression in 1997, where he remained for six months before returning to work.

In July, 2000, Boyd submitted a claim for short-term disability ("STD") benefits on account of depression and his claim was approved by Aetna. (A.R. at 559). The record reflects that Aetna sent a mental health provider statement ("MHPS") to Boyd's attending psychiatrist, Dr. Clifford Corman, to evaluate his mental disability. (A.R. at 177, 500–501, 841–42). The form asked Dr. Corman to rate how impaired Boyd's mental functional ability is in thirteen categories from "maintain attention and concentration" to "understand, remember and carry out complex job instructions" to "relate to co-workers" and "interact with supervisors." (A.R. at 501, 842). Boyd returned to work at Boeing in October, 2000. When he returned to his job, the supervisor had reorganized Boyd's department such that all of his team were gone as were most of Boyd's job duties even though he retained the title of manager.

Even with his return to work, Boyd continued to receive psychological counseling and treatment for his mental condition due in large part to the continued stressors at work. His supervisor eventually offered Boyd a new job that required Boyd to be on call 24 hours a day, seven days a week. The rigors the position required of him offended Boyd and he viewed it as yet another slap in the face after all his years of service to Boeing. (A.R. at 327). When he refused to take the new position, Boyd was demoted to a lower paying position. In April, 2002, this work stress boiled over during a meeting Boyd had with his supervisor and a company director with the session ending with Boyd storming out. (A.R. at 325). At that point Dr. Corman advised Boyd to take time off from work, a recommendation which Boyd followed. (A.R. at 303, 325).

On April 18, 2002, Boyd submitted a claim for STD benefits. (A.R. at 304). With the claim, Boyd attached an attending physician statement ("APS") form used by Aetna in processing applications completed by Dr. Corman. This form was a

generalized one that was directed primarily to conveying the physician's assessment of his or her patient's physical capabilities. Only one section of the form addressed psychiatric disabilities and then only to rate whether the patient was a class 1 through 5 in terms of the severity of his or her mental condition. Dr. Corman rated Boyd with a "class 4" disability and checked him as being markedly limited in his ability to respond to stressful situations or engage in interpersonal relations. (A.R. at 303). Dr. Corman further commented on the APS that Boyd was "unable to do his work because depression, irritability, low energy and obsessive negative thoughts." (A.R. at 303). Also included with his claim form was a signed authorization form, permitting Aetna to request and receive any records, advice or information (including mental illness information) to evaluate his claim. (A.R. at 304).

Boyd's STD benefits were initially approved by Aetna through June 30, 2002. (A.R. at 301). The approval letter stated, "If you remain disabled beyond this date, please have the enclosed medical form(s) completed by your physician and returned to our office in the envelope that is provided. Please note that this information must provide us with a clear understanding of how your disability continues to affect your work capacity." (A.R. at 301–02). An internal Aetna log note from the same date states that Boyd's STD benefits application had been certified "thru 6–30–02" per Dr. Corman's APS and then contains the line "Option 2 will send MHPS [mental health provider statement] with approval letter." (A.R. at 173). Despite the log's expression of intent to send out the MHPS there is no indication in the record that a MHPS form was ever sent by Aetna either with the initial STD approval letter or subsequent thereto.

On July 15, 2002, Dr. Corman sent to Aetna a certification statement, noting that Boyd was "too depressed and agitated to work" until October 15, 2002. (A.R. at 471). Afterwards there are indications in the record that Aetna sent out APS, but not MHPS, forms to Boyd's physicians, psychiatrists, and counselors. (A.R. at 160, 165, 171–72). In response on August 8, 2002, Dr. Corman returned a completed APS form. On the form, Dr. Corman advised Aetna that Boyd's "injury" arose out of his employment, diagnosed Boyd with major depression, cited "clinical interviews" as objective findings supporting this diagnosis, observed that Boyd was on medication, and finally concluded that Boyd "cannot perform expected [job] duties due to depression and irritability." (A.R. at 418, 420). Dr. Corman once again stated that Boyd's mental condition made him a class 4 patient, meaning he was "unable to engage in stressful situations," including those caused by having to deal with daily work demands and interacting with supervisors and co-workers. (A.R. at 420). As far as Boyd's prospective prognosis, Dr. Corman opined there would be no improvement in Boyd's condition for up to 9 months and further opined that job retraining was not a likely prospect because Boyd "feels he is too old or disinterested." (A.R. at 420).

Aetna terminated Boyd's STD benefits ten days later on the grounds that there was no "objective evidence" that Boyd was so impaired as to "preclude [him from] returning to [his] usual work duties at Boeing." (A.R. at 306–08). Notwithstanding the termination of STD benefits, two days later Aetna requested for the first time medical records from Dr. Corman and Boyd's counselor, Marge Bastedo. (A.R. at 423, 427, 555). The same day, Boyd called Aetna regarding the termination of his STD benefits. The Aetna representative told Boyd that his claim for further STD benefits was denied because his doctor "did not provide objective medi-

cal evidence that support his recommendation" to take Boyd off work; afterwards the Aetna representative made a log entry that he had included in the initial approval "packet the approval letter, and APS and a DIQ." (A.R. at 165, 168). Although it had in its possession an executed authorization form, the log entry stated that it was "the claimant's responsibility" to provide Aetna with medical records. (A.R. at 165).

Concurrent with the request for medical records, Aetna informed Boyd that the termination of his STD benefits would be maintained while it investigated his claim. On September 5, 2002, Aetna received Dr. Corman's medical records. A few days later Aetna received the medical records from Ms. Bastedo. (A.R. at 555). These records revealed Boyd's receipt of bi-weekly counseling from June to August, 2001, with depressed mood and energy. The notes document the "triggering event" of Boyd's depression—a confrontation with his supervisor in April, 2002, which left Boyd visibly shaken, trembling, and flushed. The treatment notes further documented Boyd crying during some of his sessions, and a copy of the Beck Depression test in August, 2002, revealed that he suffered from "severe" depression. (A.R. at 589).

Finally, there were a series of largely undated (but given the events noted therein presumably compiled after June, 2001) Outpatient Treatment Reports completed by Ms. Bastedo, indicating that Boyd suffered from moderate impairments in his ability to interact with peers, engage in activities of daily living, concentrate, and control his temper. (A.R. at 561–73). Ms. Bastedo also observed that Boyd suffered from marked impairments in his family situation and assigned him a global assessment of functioning ("GAF") score ranging between 50 and 55, (A.R. at 562, 564, 571), meaning that Boyd suffered from "moderate symptoms (e.g., flat affect and circum-

stantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. rev.2000). In an outpatient report dated June 11, 2002, Ms. Bastedo observed that the "primary issue has to do with his job at Boeing." (A.R. at 566). Ms. Bastedo further noted that Boyd's time off from work had been good for his mental health but that he still "ruminates about the past when he was a manager, how he was demoted, how he was recently offered a 24 hr on-call position—which is what upset him so much his MD put him off work. . . . [; Boyd would] like to have his old position back or be able to retire." (A.R. at 566).

In September, 2002, Boyd underwent a psychological examination by Dr. Thomas Curtis in connection with his worker's compensation claim against Boeing. (A.R. at 634–51). In his report, Dr. Curtis recounted Boyd's employment history at Boeing and a history of his mental illness. It was noted by Dr. Curtis during the mental status examination that Boyd "was casually and appropriately dressed and groomed"; was inarticulate and rambling "when recounting how he does not know if he can go back to his employer because of the stress"; and his speech and thought process was pressured, depressed, slow, confused and distressed particularly when describing his problems at work. Boyd was also noted as appearing tense and frustrated, and exhibiting "abnormal behavior" during the clinical interview with "manifestation of emotional withdrawal, ill-composed and depressive facial expressions, the ventilation of emotional distress and overly inclusive details." Finally, Dr. Curtis noted that Boyd "demonstrated diminished cognitive functioning in the clinical interview" as he was "slow in thinking" and that such "cognitive deficits were

caused by overwhelmed emotional coping mechanisms."

Next, Dr. Curtis conducted a battery of psychological tests on Boyd. He summarized the psychological test results as being "abnormal." The Beck Inventory revealed that Boyd suffered from "severe" depression and anxiety, and in "need for emotional treatment to reduce or remove suicidal ideation." Boyd was also administered the MMPI–2, resulting in "abnormal" scores for "extreme depression commonly associated with anorexia, sleep disturbance, emotional withdrawal, feelings of inadequacy and diminished psychological energy drive." As Dr. Curtis summarized, "the valid psychological tests reflected abnormal depression, anxiety, mistrust/touchiness, and mental confusion/dysfunction."

Dr. Curtis diagnosed Boyd with a depressive disorder not otherwise specified with anxiety. He opined that "[m]ore time will be needed for further rest, recuperation and physical and emotional healing"; and that Boyd's "emotional complications should not be considered as permanent and stationary until the medical condition has progressed more into a stationary status." Finally, Dr. Curtis opined that "Boyd [is] too depressed, anxious, confused and unable to control his emotions to work at this time. Boyd needs to work through the emotional complications in the further passage of time and in supportive psychotherapy prior to attempting to return to any job." Dr. Curtis warned that "[i]f he were to attempt to return to work now, his emotional condition would probably soon deteriorate into worsened emotional dysfunction." Dr. Curtis recommended that Boyd be "provided with an initial course of individual supportive psychotherapy on a once-to-twice weekly basis for a preliminary period of approximately three months," and that "stress-reduction bio-

feedback" be done "to appease these stress symptoms." There are indications in the record that Boyd followed such a course of biofeedback treatment for the months September and October of 2002. (A.R. at 622–24, 630). Finally, Dr. Curtis made the following observations: "It cannot yet be determined, on a psychiatric basis, whether Boyd will eventually be emotionally able to engage in the occupation he performed at the time of the injury" and that "it would not yet be possible to estimate the residuals of permanent emotional impairment, if any," but that "it would appear likely that there will be substantial residuals of permanent emotional impairment."

In the meantime, Boyd was approved for Social Security disability benefits in October, 2002. (A.R. at 405).

The termination of Boyd's STD benefits was upheld by Aetna on reconsideration on October 17, 2002, again without any medical review of the record.[2] (A.R. at 154). Aetna again advised Boyd that, despite the medical records tendered by his physicians, they failed to provide "objective evidence" that he suffered from an impairment that prevented him from "returning to [his] usual work duties at Boeing." (A.R. at 309–11). Instead, Aetna noted that Boyd's problem was due to his "discontent" with his job situation, something which is "not a disabling condition." (A.R. at 154). The denial of his request for reconsideration prompted Boyd to call an Aetna representative on October 24, 2002. The substance of their telephone conversation was recounted as follows by the Aetna representative:

S/w [spoke with] the clmt regarding his denial. He wanted to know how to substantiate his claim. I explained to him in a thoroughly and using many examples what we look for in a review of the med recs. The clmt was very attentive

2. Aetna did not, at the time of this STD denial, have in its possession Dr. Curtis' report.

and did not display any cognitive difficulty or slowness. The clmt stated that he would have his w/c [worker's compensation] psychiatrist forward us their med recs. I indicated that we would review these once received. The clmt stated that he believes these will be helpful as well since he is a dr., and the records that we have had were not of this caliber. I stated to the clmt that he sounds good to me and seems to be managing the situation well. The clmt stated that this is misleading and subjective at best. The call termed.

(A.R. at 149).

Boyd thereafter appealed the STD termination decision. In his written appeal, Boyd informed Aetna that he had been approved for social security disability benefits. (A.R. at 316). On November 7, 2002, Aetna acknowledged receipt of Boyd's written appeal and reminded him that "any new, relevant information should be submitted as soon as possible." (A.R. at 318). The same day an Aetna representative completed an "Appeal Submittal Form." (A.R. at 312–14). Under a section of the form titled "Documents to Send to Appeals Unit" the following were marked as not applicable: Functional capacity forms, functional demands profile form, report of functional capacity evaluations, and report of independent medical examination. Next to the category "Job Description" it was noted "will order," but there is no indication in the record that Aetna ever received a copy of Boyd's job description.

Two weeks later on November 25, 2002, Aetna had the first medical review conducted of Boyd's claim by John Disantis, a behavioral health specialist. Mr. Disantis concluded:

There are certain concerns regarding this claim. There are HR issues that have been ongoing for at least two years. The clmt was lax in providing clinical information and failed to indicate that he was in therapy with someone else besides Dr. Corman. The subsequent medical records shows the extent of the work issue and the degree of the clmt's emotional issues related to this. The concerns regarding objective evidence based on the 8/8/02 APS was understandable given that the last OV [office visit] was listed as 7/03/02 and there was no evidence of other treatment. However, based on the new information there are several clinical issues due consideration: The clmt apparently has had incidences of significant depression in the past.... While the trigger for the depression might have been work related issues, it appears that the clmt was showing significant depressive symptoms in April that medical leave appeared appropriate. While there continues to be minimal objective evidence of functional impairment noted in the record, the records do show continued complaints and symptoms at least through July.... While the inconsistencies in this claim are troubling, there appears to be sufficient question as to the level of depression and impairment after 6/30/02 to August. Based on these considerations recommend overturn the denial date of 6/30/02 and continue the claim to 8/31/02. Suggest terminate the claim on this date pending updated medical records.... If the updated medical record continues to be unclear as to the level of work capacity related to general depression not associated with the specific work place, suggest the need for a psychiatric IME [independent medical examination] at some point in time. Otherwise would consider maintaining the denial date of 8/31/02.

(A.R. at 140–43, 324–331). Significantly, it does not appear that in reviewing the medical records in the file Mr. Disantis considered (or was presented with) Dr. Curtis'

September, 2002, report, as it is nowhere mentioned in his summary of the claim file.

Instead of referring Boyd for an independent medical examination as recommended by Mr. Disantis, it was decided by Aetna on December 16, 2002, to extend Boyd's STD benefits through August 31, 2002, with the STD claim thereafter being "returned to the claims department for investigation of your eligibility" beyond that time. (A.R. at 332). A separate letter was issued to Boyd explaining to him that, for him to get STD benefits beyond August 31, 2002, he had to submit "medical documentation that clearly supports a disabling condition that affected your ability to perform the functional duties of your job" and, by way of example, requested that he provide documents with "[a] detailed description of your limitations and restrictions, with objective medical findings to support those limitations." (A.R. at 333). The next day an Aetna representative called Boyd and left a message on his answering machine that "we need updated med info that clearly indicate a disability that affects his functional capacity to work." (A.R. at 131). The same day Boyd called an Aetna representative asking "why soc. sec. disability is considering him disabled and we're not, at least past 8–31–02 . . . . [h]e feels he's given us all we need." (A.R. at 128).

The following day, Aetna sent out a request for medical records from Dr. Curtis, to which Dr. Curtis apparently did not respond. (A.R. at 385, 389, 608–09). On January 30, 2003, Aetna sent a letter to Boyd informing him that "there is not enough information at this time to extend" his STD benefits, and then noted that Aetna had not received medical records from Dr. Curtis. (A.R. at 343).

On February 5, 2003, Boyd inquired about the status of his STD claim, reiterated that he did "not understand why we are not approving his claim ... [given that]

s[ocial] s[ecurity] approved and that they are one of the most strict," and was again advised that Aetna had not yet received records from Dr. Curtis. (A.R. at 117). Boyd was further advised that "at this point" he was "responsible for retrieving medical records" and that the claim representative "had done the claimant a favor by requesting [the records beforehand]." (A.R. at 117). On the same day, Aetna was notified that Dr. Curtis routinely waited one month before sending out records after a request was made. (A.R. at 116). Finally, on February 7, 2003, Aetna received the previously-described report by Dr. Curtis as well as his treatment notes. (A.R. at 634).

On March 12, 2003, Aetna decided to "re-certify" Boyd's STD benefits an additional six weeks to October 13, 2002, and concluded his STD benefits as of that date. Aetna forwarded his application for LTD benefits for review, and in the interim paid him LTD benefits with a reservation of rights. Despite all the medical evidence of record, the Aetna claim representative advised Boyd that there still was "no objective information" regarding his claim. (A.R. at 113). The claim representative requested that the medical records be reviewed by the medical staff for a determination of Boyd's entitlement to LTD benefits. (A.R. at 113). On March 18, 2003, Aetna sent Boyd a letter summarizing these actions by informing him that his "weekly [STD] benefits have concluded and you will be paid through October 13, 2002, ... this concludes your [STD] benefits . . . . [Y]our claim has been referred to a long-term disability analyst for review. . . . At this time, to illustrate our intentions of good faith, we will agree to pay your monthly LTD claim with Reservation of Rights. By instituting our Reservation of Rights we are paying this claim without an admission of liability. Monthly benefit payments will be made while we

complete our investigation.... Your application for long-term disability benefits has been approved effective October 14, 2002." (A.R. at 349).

In connection with his LTD claim, Boyd completed a questionnaire on March 24, 2003, wherein he noted that he cannot perform any work because of an inability "to focus, concentrate, [and] remember," but that he can take care of his personal needs, does laundry, "just began [going to] church," "email friends," does some "light reading," and rides a horse an hour once a week. (A.R. at 414–15). Finally, Boyd noted having difficulty sleeping at night as he "wak[es] up several times per night," and disavowed any interest in "seeking training" to do some other line of work and did not anticipate returning to his past job. (A.R. at 414–15).

The medical records were first sent to a nurse employed by Aetna to review. Due to the "complexity of the file" the nurse recommended a review by a psychiatric consultant. (A.R. at 110). On March 17, 2003, Dr. Dona Wicher, an in-house psychologist, was asked to review Boyd's claim with a focus on "what is the severity of the claimant's current condition based on the objective data" and "what is the claimant's current functioning as supported by the exam/test findings?" (A.R. at 813). In response, Dr. Wicher submitted a memorandum on April 8, 2003. (A.R. at 815–17).

In the memorandum, Dr. Wicher observed that Boyd had been seeing Ms. Bastedo "twice a month at the time he left work [in April, 2002,] and continued to see her bi-monthly"; and highlighted the July 3, 2002, treatment note from Ms. Bastedo that "Boyd was going to travel to Laughlin, Nevada, to tend to a rental property" and the July 17, 2002, session note indicating that "Boyd was discussing retirement and a possible geographic re-location with his common-law wife of 23 years." From

these activities, Dr. Wicher concluded that Boyd was "functioning well enough that he was able to travel to a rental property he owned in order to deal with" rent, and "was also discussing his future and the possibility of a move with his common-law wife" thereby indicating that he could "use judgment and mak[e] decisions as well as potentially influencing others." Finally, Dr. Wicher took away from the fact that Boyd was only seeing Dr. Bastedo twice a month that he did not suffer from "a high level of distress" because "when individuals are experiencing significant distress they are seen weekly or even twice weekly." Insofar as Dr. Curtis' report is concerned, Dr. Wicher gathered from it that Boyd was "described ... as appropriately dressed and groomed" and that "no clear evidence of diminished cognitive capacity or deficits were described." Dr. Wicher downplayed much of the psychological testing as being "primarily based on self-report[ing]," and cast suspicion on the MMPI–2 results as it did not "document observable impairment, cognitively or otherwise." Dr. Wicher then concluded that, while Boyd may suffer "considerable emotional distress ... about his former place of employment," nothing in the "records ... document[s an] impairment in functioning to a degree which would prevent him from resuming his usual job duties for ... Boeing." In short, for Dr. Wischer "there [was] no documented evidence of impairment in functioning so severe that [Boyd] could not work in the same capacity for other supervisors.... If Boyd is demonstrating diminished cognitive capacity or impairment in functioning, evidence of that impairment is not contained in the chart."

On May 7, 2003, Aetna advised Boyd that his LTD claim was denied because "the data" he submitted "did not contain evidence of a severe functional impairment as a result of your psychological diagnosis to the extent that you would be precluded

from working as a manager." (A.R. at 819). Aetna explained its review process as follows:

> In determining whether or not you have a disability as defined, we first must determine the severity of your diagnosis, and assess how your function has been impacted as it relates to the functional requirements of your occupation. To do this, we obtain and evaluate medical data that is critical in determining severity of conditions, and analyze exam/test findings or clinical observations for indicators of functional impairment in the areas that are associated with the requirements of your occupation.... Given the limited information on the Attending Physician's Statements we received, ... we typically request more detailed medical data in the form of medical records from your treating physician.... On the basis of the information available, there is no objective evidence that you are suffering from sufficient impairment to preclude returning to your usual work duties at Boeing.

(A.R. at 820–21). The LTD denial letter then went on to repeat nearly verbatim the observations and conclusions expressed in Dr. Wicher's April, 2003, letter, and made them Aetna's own:

> In severe psychological disorders that are considered to preclude a person from working, we would expect to find, but not limited to, the restriction of no driving, abnormal neuropsychological test findings, documentation of abnormal thought processes, and the inability to perform activities of everyday living (i.e. driving, personal care, keeping appointments), or a general low level of day-to-day functioning. Unfortunately, the data has indicated otherwise. In summary, on the basis of the information available, there is no objective evidence of impairment that would preclude you from returning to your usual position

with ... Boeing. You were appropriately dressed and groomed during your evaluation of September 11, 2002, and earlier, according to Ms. Bastedo, had been functioning well enough that you were able to travel to a rental property you own in order to deal with work which was needed due to a turnover in renters. You were also discussing your future and the possibility of a move with your common-law wife, a process that would involve using judgment and making decisions as well as potentially influencing others. In addition, the frequency of treatment with Ms. Bastedo was reportedly twice a month, a frequency that would not indicate a high level of distress. Ordinarily, when individuals are experiencing significant . distress, they are seen weekly or even twice weekly. While it is clear that you regard your former supervisors as having harassed you and it is unlikely that you would wish to return to work under their supervision, there is no documented evidence of impairment in functioning so severe that you could not work in the same capacity for other supervisors. Although you do express subjective complaints of cognitive and emotional dysfunction, there is no objective evidence of such impairment or dysfunction contained in the chart.

(A.R. at 822–23). Aetna informed Boyd that, should he wish to appeal the LTD denial, he must submit "[a] detailed description of your limitations and restrictions, with objective medical findings to support those limitations." (A.R. at 823). Again, although it possessed a form that would set forth such a detailed description—the MHPS—Aetna did not forward it to Boyd or his psychiatrists/counselor to complete.

There was no explanation to Boyd as to the type of "objective evidence" of functional impairment that Aetna would accept

as proof of his claim. Rather, Aetna simply advised him to submit additional evidence such as a detailed description of his limitations with objective medical findings supporting those limitations. (A.R. at 822). Aetna made no offer or suggestion that Boyd's physicians complete or even noted the existence of a MHPS form even though, as explained below, such a form is routinely utilized by Aetna as "objective evidence" of functional impairment in cases involving mental ailments.

Following Aetna's instructions Boyd's therapist, Ms. Bastedo, sent Aetna a three-page letter explaining Boyd's treatment and limitations. (A.R. at 825–29). Ms. Bastedo began by disavowing any impression conveyed by her notes that Boyd was only "moderately depressed": "What I should have said was that this man has a very hard time sharing his feelings and that having him come in to see me twice a month was the best he could do. He is 'old school' in the fact that it isn't manly to complain and cry.... Since [leaving Boeing in April, 2002,] Boyd has consistently gotten more depressed." Ms. Bastedo then explained that Boyd initially wanted to continue to work at Boeing, but that over time he has become "reconciled that Boeing was not going to help him." Ms. Bastedo then explained that in addition to the other factors contributing to his depression, recently Boyd's "relationship of 20 plus years had deteriorated to the point that his partner decided he was too depressed for her and she has found someone else to be with. This has only added to his depression and subtle rage." It was this breakdown in his personal relationship, not some diminution in his depressive state, that prompted his moving from his home. Ms. Bastedo also explained that the short trips and horseback riding referenced in the denial letter were merely forms of therapy suggested by her for Boyd, not some indicia of improvement in his mental health or that he could super-

vise people. Finally, Ms. Bastedo noted that she had suggested to Boyd that he seek admittance to "a psychiatric hospital" but Boyd was "horrified about the prospect." Ms. Bastedo concluded: "My strong opinion is if he ends up in the hospital, [Aetna] may then believe he is in no shape to return to work."

An Aetna nurse reviewed Ms. Bastedo's letter on May 29, 2003, concluding that from the comments in the letter, Boyd "seems to be able to function well to take care of his affairs, take short trips and ride horses." (A.R. at 87). The Aetna nurse took away from Ms. Bastedo's letter that Boyd had "rejected more frequent treatment" and "refused to consider hospitalization," finding both as indications on Boyd's part that he did not view his condition as being serious. (A.R. at 87). The Aetna nurse then made the following observation: "It is paradoxical that Ms. Bastedo indicates clmt is unable to supervise anyone, and yet she also reports that his job had changed so that he had no one to supervise. The information provided indicates that Mr. Boyd is able to take care of his business affairs and be fairly active in spite of his reported depression. Inability to work is not supported." (A.R. at 87). Boyd was later informed the same day by Aetna that the letter sent by Ms. Bastedo was insufficient to overturn the denial of LTD benefits. (A.R. at 358).

Boyd then sent a letter on July 19, 2003, which was later read by Aetna as an appeal of its decision. In the July, 2003, letter Boyd also referenced the breakdown of his personal relationship, explained that he has been under treatment for depression since December, 1997, and, much like Ms. Bastedo's letter, sought to clarify or explain the activities noted in the denial letter. Aetna requested a psychiatric review by an in-house physician, Dr. Mark Schroeder. Under a section titled "Refer-

ral Question" Aetna asked Dr. Schroeder whether "the medical records in the claim file reasonably support a continuing PSYCHIATRIC impairment of such severity that the claimant would have been unable to perform his usual or a similar occupation (Manager) FOR ANY EMPLOYER beyond 5/7/03?" and "[t]o what degree do workplace-specific issues contribute to the claimant's inability to return to his usual position?" Aetna further advised Dr. Schroeder that there was no job description in the file and that, since Dr. Wicher's review, Boyd had provided evidence of further psychiatric trauma and that Ms. Bastedo had submitted a letter in support of his appeal. (A.R. at 364).

Dr. Schroeder submitted a report on November 25, 2003. Dr. Schroeder began by noting Boyd's July, 2003, letter, but took from it (as well as "a number [of other] letters" submitted by Boyd) that it "was well-organized and detailed in presentation of personal history and claim-related information" contradicting Boyd's assertion made in the claim questionnaire from March 24, 2003, that he was "unable to work because of impaired memory and concentration." Dr. Schroeder also made mention of Boyd "attending church, horseback riding, light reading, and emailing friends"; and that Boyd said "he would not be interested in training for another occupation." Dr. Schroeder discounted Boyd's 2002 treatment records. While they indicated Boyd's "distress about work and family issues, and subjective complaints," Dr. Schroeder observed they do "not document severe psychiatric symptoms or objective evidence of significant psychiatric functional impairment." Under the section of the report titled "Case History Summary" Dr. Schroeder stated as follows:

> Medical records from psychotherapist Ms. Bastedo ... and psychiatrists Dr. Corman ... and Dr. Curtis ... describe primarily the EE's report of anger, de-

pression and anxiety related to a number of work and family issues. These records do not present evidence of severe psychiatric symptoms (such as active suicidal or homicidal thoughts, or psychotic or manic symptoms), or objective evidence supporting significant psychiatric functional impairment. Dr. Corman's final OVN [office visit note] in the claim file of 8–21–02, stated that the EE was 'doing well.' Problems with memory and concentration were reported, but no detailed, objective evaluation of cognitive capacity was provided (as by neuropsychological testing with validity scales). The detailed report of Dr. Curtis of 9–3–02 documented an MSE [mental status examination] that was essentially within normal limits, except for pressured, inarticulate and rambling speech particularly when discussing his dissatisfaction and perceived mistreatment at work; despite this, the EE provided a detailed account of his personal history for the examiner.

In a Claim Questionnaire of 3–24–03, the EE reported attending church, riding horses, reading and emailing friends; in letter of 5–22–03, Ms. Bastedo reported encouraging the EE to ride horses and take short trips, and noted that the EE was preparing to pack to move. The EE's ability to perform these activities does not support that he is suffering from severe psychiatric functional impairments.

The claim file contains significant evidence of a work setting issue. The EE had reported to his providers longstanding issues with dissatisfaction with his job; that he had left work when 'offended' at being offered an undesirable position; harassment at work and demotion. Dr. Gromis and Dr. Curtis stated that EE's emotional distress was related to work stress. In Questionnaire of 3–24–03, the EE stated that he

was not interested in training for another job. The claim file does not present evidence that the EE has been attempting to RTW [return to work]. These work issues, and Dr. Curtis' diagnosis of Dependent and Avoidant personality traits, provide a reasonable alternative explanation for the EE's prolonged absence from work.

(A.R. at 368). Under the section of the report entitled "Recommendations" Dr. Schroeder made the following observation: "The medical documentation in the claim file does not substantiate psychiatric functional impairment sufficient to preclude the EE from performing own occupation for any employer beyond 5–7–03. Additional evidence relevant to a further consideration of this claim would include any objective evidence addressing the psychiatric functional capacity of the EE." (A.R. at 368).

On December 22, 2003, Aetna sent Boyd a letter denying his appeal for LTD benefits because "there is no compelling evidence that [his] medical condition resulted in a functional impairment of such severity that [he] would have been unable to perform the duties of [his] own occupation ...." (A.R. at 381–83). The basis for the appeal denial was predicated nearly entirely on the observations and conclusions contained in Dr. Schroeder's report. For example, Aetna informed Boyd that there was no "objective evidence supporting significant psychiatric functional impairment," that there was no "evidence of severe psychiatric symptoms, such as suicidal or homicidal thoughts, or psychotic or manic symptoms," and that much of his mental distress is attributable to the peculiarities of his "work-setting issue" something which would not "substantiate a psychiatric functional impairment sufficient to preclude [him] from performing [his] own occupation for another employer." (A.R. at 382).

Aetna had in place an established claim procedure for substantiating functional limitations for claimants with mental ailments. Aetna was served with an interrogatory that inquired about what specific type of evidence it would accept as "objective evidence" of a mental/nervous condition and the claimant's mental functional capacity. (Decl. Corinne Chandler, Ex. A at 4, 7–8). In response, Aetna produced no less than three different forms which it sends to attending physicians to measure a claimant's psychiatric functional impairment: An authorization form for medical records, an attending physician behavioral statement, and the MHPS form. (Decl. Corinne Chandler, Ex. A at 4, 7–8). These forms require the physician to give a multi-axial diagnosis, recite objective findings in support of that diagnosis, describe how work stressors by themselves impact the claimant's ability to function, and, most importantly, recite how much, if any, the claimant's ability to perform a number of job functions is impaired by his or her mental condition. (Decl. Corinne Chandler, Ex. A at 11–15). Other than the authorization for medical records, Aetna did not send any of these forms to any of Boyd's physicians during the time periods relevant to his STD and LTD claim. Indeed, Aetna did not make any effort to contact Boyd's physicians (other than boilerplate requests for medical records) at any time during the two-year period his claim for benefits was under review. In short, despite the fact that Aetna had specific forms designed to elicit the type of information they found lacking in Boyd's claim file—the request for "objective evidence" of Boyd's mental functional capacity that Dr. Schroeder and Mr. DiSantis recommended obtaining (presumably either through an IME or the completion of a MHPS form), and which throughout the process Aetna was insistent in obtaining from Boyd—they never made those forms

available for Boyd to use to substantiate his claim.

## II. ANALYSIS

 Ordinarily, the Court reviews decisions made by plan administrators *de novo*. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir.1999)(en banc)(quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). An exception applies when the plan confers discretionary authority on the administrator or fiduciary to construe the terms of the plan or to determine benefit eligibility. *See Kearney*, 175 F.3d at 1089. The burden is on the administrator to show that the plan gave it such discretionary authority. *Id.* Both parties in this case agree that Aetna actually made the decision to deny Boyd's claim. (Pl's Mot. Determine Std. at 1; Defs' Opp. at 4). They disagree, however, over whether the plan gave Aetna discretion in making that decision, and hence, whether Aetna's decision is entitled to a deferential standard of review by this Court.

Boyd offers two arguments for why Aetna's decision is not entitled to deferential review: (1) The language in the plan documents do not confer such discretionary authority to Aetna, and (2) even if the plan documents do so, Aetna's decision was marred by an actual conflict of interest.[3] The Court will address each contention in turn.

### A. *Plan Language*

 "An administrator has discretion only where discretion is unambiguously retained. The default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees*, 244 F.3d 1109, 1112 (9th Cir.2001) This Court must therefore examine the text of the plan documents to determine whether it "unambiguously" states that Aetna has discretionary authority in making benefit decisions.

 The standard of review depends on whether the "plan documents unambiguously say in sum or substance that the Plan Administrator or fiduciary has authority, power, or discretion to determine eligibility or to construe the terms of the Plan[.]" *Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000). Although the plan must effectively grant the administrator discretion in interpreting the plan or determining eligibility, there is no requirement that the word

---

**3.** Boyd also argues that vesting discretion with plan administrators is against public policy. He points to a recent letter from the California Department of Insurance suggesting that grants of discretion to plan administrators in insurance policies and ERISA plan documents render such contracts/plans "illusory" and "objectionable" under California Insurance Code section 10291.5. This issue has been dealt with by a number of district courts in California with near unanimity in agreement against the position Boyd advances in this case. *See Horn v. Provident Life & Acc. Ins. Co.*, 351 F.Supp.2d 954, 964 n. 4 (N.D.Cal.2004); *Firestone v. Acuson Corp. Long Term Disability Plan*, 326 F.Supp.2d 1040, 1050–51 (N.D.Cal.2004); *Mitchell v. Aetna Life Ins. Co.*, 359 F.Supp.2d 880, 888–89 (C.D.Cal.2005); *Moskowite v. Everen Capital Corp.*, 2005 WL 1910941, at *4–5 (N.D.Cal. Aug.10, 2005); *Williston v. Norwood Promotional Products, Inc.*, 2005 WL 1877136, at *6–7 (C.D.Cal. April 12, 2005); *Toth v. Automobile Club of Cal. Long Term Disability Plan*, CV01–4653–MMM, 2005 WL 1877150 (C.D.Cal. Jan. 28, 2005); *but see Fenberg v. Cowden Automotive Long Term Disability Plan*, 2004 WL 2496174, at *1–2 (N.D.Cal. Nov. 2, 2004). As the Court cannot add more to the well-reasoned and articulated opinions those courts have provided on this issue, it adopts their reasoning as its own.

"discretion" be used. *Id.* (observing that "there is no magic to the words 'discretion' or 'authority' ").

Aetna points to language contained in three different documents as purportedly unambiguously granting it discretionary authority to make benefit decisions or interpret the plan language. The Court need only discuss one of those documents, the 2000 edition of the summary plan description ("SPD"), as it is clear that such discretionary authority was provided to Aetna therein.

Under the section titled "Plan Highlights—General Plan Provisions" the SPD states:

> Benefits payable under the Plan are limited to the benefits specified by the Plan. The Plan Administrator, Boeing Service Center, and service representatives that make benefit payments administer the Plan strictly in accordance with its provisions. The Plan Administrator and service representatives have the right to recover overpayments, regardless of the cause, nature, or source of the overpayments. The Company authorizes the Boeing Service Center and service representatives to interpret the Plan and to decide appeals. Participants' appeal rights and the responsibilities of the Boeing Service Center, service representatives, and Plan Administrator are specified in the Plan.

(A.R. at 926). When speaking of LTD benefits, the SPD notes that "[t]he service representative for the Long Term Disability Plan is Aetna Life Insurance Company" and then goes on to state that "[a]ll determinations of total disability are made by the service representative within the terms of its group insurance contract with the Company." (A.R. at 941). Finally, under a SPD section titled "Review and Appeal Procedures" it is noted that "[t]he service representative will review the appeal" from a claim denial decision concerning "short term or long term disability benefits" "and render a decision. In reviewing your appeal, the service representative will apply the terms of the Plan and will use its discretion in interpreting the terms of the Plan." (A.R. at 960). This section further notes that any "[a]ppeals involving the denial of a person's eligibility to participate in one of the company's plans are heard by the Boeing Service Center, not the service representative." (A.R. at 960).

The fact that the SPD explicitly states that Aetna has the "discretion" to "interpret[ ] the terms of the Plan" to decide whether to grant or deny benefits is sufficient to convey an unambiguous grant of discretionary authority. *See Jordan v. Northrop Grumman Welfare Benefit Plan,* 370 F.3d 869, 875 (9th Cir.2004)(holding following plan language unambiguously conferred discretion to administrator: "Travelers has the discretion to construe and interpret the terms of the Plan and responsibility to make factual determinations"); *McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1107 (9th Cir.2000)(plan administrator "has sole discretion to interpret the terms of the Plan" sufficed); *Friedrich v. Intel Corp.,* 181 F.3d 1105, 1110 n. 5 (9th Cir.1999)("sole discretion to interpret the terms of the Plan and to determine eligibility for benefits" sufficed); *Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1161 (9th Cir.2001)(administrator's decision "shall not be overturned unless arbitrary and capricious" sufficed).

Despite this seemingly clear language in the SPD, Boyd nonetheless contends that it is insufficient as there is no way to determine whether the discretionary authority granted to Aetna was related to LTD benefits as opposed to the other types of benefits provided for under the plan. As he explains:

> The language quoted ... is [contained in] a general section entitled "Review

and Appeal Procedure" and is not contained in the four pages of the SPD that describe the long term disability coverage. There is nothing in the general "Review and Appeal" Section that suggests that its provisions govern long term disability claims as opposed to any other plans described in the SPD. Indeed, a description of benefits under the Basic Life Insurance Plan, the Supplemental Life Insurance Plan, the Accidental Death and Dismemberment Plan, the Supplemental Accidental Death and Dismemberment Plan and the Business Travel Accident Plan are all placed between the provision relied upon . . . and the description of long term disability coverage contained in the SPD. The language relied upon . . . cannot, under any stretch of the imagination, be characterized as "specifically relating to long term disability claims."

(Pl's Reply at 14 n. 11). Boyd's stress on the need for there to be a close proximity between the SPD provision using the term "discretion" and the section of the SPD concerning LTD benefit coverage is misplaced for two reasons. First, there is no requirement, either statutory or in the caselaw, requiring plan provisions to be tethered together in such a fashion for them to be given effect. That a section on how Aetna will review and determine applications for LTD benefits is two pages or twenty pages away from the part of the SPD identifying whether Aetna has any discretion in making disability coverage decisions in no way affects whether the SPD confers discretion or not. More importantly, the factual premise underlying Boyd's argument—that the SPD's mention of discretion in the Appeal and Review section does not "specifically relate to long term disability claims"—is incorrect.

The Appeal and Review section begins by informing the reader that its provisions concern only those claims made for short-term and long-term disability benefits:

"You should send your claim for *short term or long term disability benefits to the Plan's service representative.*" The section then goes on to make clear that all other benefit claims under the plan—the life insurance and accidental death and dismemberment benefits mentioned by Boyd—are to be submitted to the Boeing Service Center, not Aetna: "Claims for life insurance or accidental death and dismemberment benefits should be reported to the Boeing Service Center." The remainder of the section then elaborates on how Aetna will review the denial of disability benefits (be it short-term or long-term), included within which is mention that Aetna "will apply the terms of the Plan and will use its discretion in interpreting the terms of the Plan." Far from suggesting that it would be a "stretch of the imagination" to connect the discretion language contained in the Appeal and Review section with a claim for LTD benefits, the SPD provision makes such a connection between the two plain and patently obvious.

Alternatively, Boyd argues that the SPD provision cannot be used as another portion of the SPD contradicts it by vesting such discretionary authority over LTD benefits to another entity, the Boeing Employee Benefit Plans Committee ("EBPC"). Under the section of the SPD entitled "Special Disclosure and Other General Plan Information" it is noted that the EBPC, "[a]s Plan Administrator, . . . has authority over administration of the Plan and has all powers necessary to enable it to carry out its duties as Plan Administrator, such as determining questions of eligibility and benefit entitlement. The Plan Administrator has authority to make these determinations in its sole discretion. The Plan Administrator's decision upon all such matters is final and binding." While this would seem to provide an entirely different entity with the discretionary authority that Aetna now

claims to possess, the section from which this alternative path of discretionary authority is drawn goes on to note that the EBPC "may ... [d]elegate these and other administrative duties and responsibilities to persons or entities of its choice."

■ Boyd argues that there is no evidence that the EBPC ever delegated its authority over "benefit entitlement" to Aetna, leaving two conflicting provisions in the SPD on the point and requiring that the Court give the benefit of such a conflict to Boyd. *Cf. Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1145 (9th Cir.2002)("it would be unfair to have the employees bear the burden of a conflicting SPD and plan master document and, thus, [we] decide[ ] that the provision *more favorable* to the employee control[ ]" (emphasis in original)).

ERISA allows a plan to "provide for procedures ... for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan." 29 U.S.C. § 1105(c)(1). Here, the SPD sets forth no particular type of procedure that must be followed for the EBPC to express its intent to delegate some or all of its authority. This gap is of no moment as the preface to the SPD itself contains such an expression of intent to delegate the EBPC's authority to Aetna. There it is noted that the Company, which necessarily includes the EBPC as it is "appointed by" and is drawn from "the Board of Directors of the Boeing Company," "authorizes" the "Boeing Service Center and service representatives[, which includes Aetna,] to interpret the Plan and decide appeals." (A.R. at 926, 966). The Court, in keeping with the term's ordinary usage, reads the preface's use of the word "authorize" as signifying a delegation of authority from the Company to these respective entities. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 78 (10th ed.1999)(defining authorize as "to invest esp, with legal authority: Empower"). With such an effective delegation of authority to Aetna of the powers the Appeals and Review section notes. that it has the perceived conflict in the SPD disappears.

### B. *Conflict of Interest*

■ The abuse of discretion standard of review of a plan administrator's decision denying benefits can be heightened when there exists a "serious" conflict of interest. *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 943 (9th Cir.1999). Such a serious conflict is not established simply by the fact, as here, that the insurance policy is both funded and administered by the same party. The Ninth Circuit has held that such a situation only gives rise to an inherent conflict between the administrator and the beneficiaries. *See Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 797 (9th Cir.1997)("Given Standard's dual role as both the funding source and the administrator of the Plan, we are faced with an inherent conflict of interest situation"); *Jordan*, 370 F.3d at 876 ("Though the claimant obviously has a financial interest in getting the money, while the plan has a financial interest in keeping it, that alone cannot establish conflict of interest in the administrator, because it would leave no cases in the class receiving deferential review under *Firestone* "). In such a situation an inherent conflict will only rise to the level of a serious one if "the beneficiary ... come[s] forward with material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrative's fiduciary obligations to the beneficiary." *Bendixen*, 185 F.3d at 943. If the beneficiary is able to shoulder this burden of proof, "the plan bears the burden of producing evidence to show that the conflict of interest did not

affect the decision to deny benefits." *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1109 (9th Cir.1999). If the plan does not meet this burden, courts will review the decision denying benefits *de novo*. *Id.*

While " '[t]he Ninth Circuit has never explicitly defined the parameters or contours of what might suffice to constitute a breach of fiduciary duty in this context,' it has, without declaring an exhaustive list, stated that 'material, probative evidence' may consist of 'inconsistencies in the plan administrator's reasons, insufficiency of those reasons, or procedural irregularities in the processing of the beneficiaries claims.' " *Wible v. Aetna Life Ins. Co.*, 375 F.Supp.2d 956, 968 (C.D.Cal.2005).

Boyd argues that the most glaring example that Aetna's inherent conflict of interest became one of real substance in his case was that while it demanded "objective proof" of "functional incapacity," Aetna did not provide him any of the forms it had in its possession—the MHPS form or the attending Physician Behavioral Health Statement form—that would have relayed the very information they insisted his claim record lacked. Such "procedural irregularities" in the claim administration process it is alleged should divest Aetna of any discretion. There is much to recommend for Boyd's position.

"ERISA plan administrators do not have unbounded discretion" in reviewing and in denying claims for benefits. *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir.1997). Restrictions and requirements are placed on how plan administrators handle claims by statute and regulation. *See id.* In simple terms what these statutory and regulatory provisions "call[ ] for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it." *Id.*

Here, Boyd argues that it was not so much that Aetna did not tell him what information they wanted, but that they failed to give him the means—the above described forms—that would have assisted him in accomplishing that very task. While this may go a step beyond what the ERISA regulations call for, the concept is so encapsulated in the purpose and spirit of the ERISA regulations themselves as to be considered almost a necessary corollary to them. In telling a beneficiary what "more information is needed," a plan administrator is not left free to state the request yet hold back at the same time something (a document, a form, etc.,) in its possession that would aid or assist the beneficiary in providing that very information. The whole purpose for this dialogue is for it to be a meaningful one; a conversation where both sides put on the table all that they need and have. It is not to be an exercise where the plan administrator gets to play hide and seek; hiding the forms and then leaving the claimant to his or her own devices to seek out a means of satisfying the administrator's request. Plan administrators are not to act like the Oracle at Delphi, speaking in broad, open-ended generalities and leaving the beneficiary to guess how to solve the riddle so asked. If the plan administrator insists that it is the lack of "objective evidence" of Boyd's "functional restrictions" that stands in his way of obtaining benefits, then it should at the same time give him the forms it has in its possession where his doctors can provide that objective evidence to them. "There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters." *Booton*, 110 F.3d at 1463.

Buttressing the Court's reasoning is that the plan documents themselves require such pro-active behavior on Aetna's part. While "nothing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists," ERISA did not "erect a single regulatory edifice for the handling of benefit claims." *Gaither v. Aetna Life Ins. Co.*, 388 F.3d 759, 771 (10th Cir.2004). Rather, ERISA allowed for much leeway in the statutory joints to be filled in by the terms of the benefit plans fashioned by employers. The terms of the plan itself thus must also be consulted in determining the restrictions and obligations of the plan administrator in adjudicating benefit claims.

Here, the Plan provided that claimant's "must submit [their] claim to Aetna in writing on forms supplied by Aetna," and must provide Aetna "with authorization to allow it to investigate [their] claim." (A.R. at 920). The plan further required the claimant to "furnish such true and correct information as Aetna may reasonably request" from them. (A.R. at 920). These plan provisions envision a cooperative effort in adjudicating benefit claims. The claimant has the duty to provide relevant evidence to Aetna, but by the same token such information would be submitted "on forms supplied by Aetna" and even then the information would be for what "Aetna reasonably requests." Far from establishing an adversarial process where "the claimant is responsible to decide what evidence would be sufficient to prove his claim," the Plan grants Aetna a considerable amount of latitude "to determine what kinds of evidence it needs to determine a claim's validity" and requires the claimant to cooperate in Aetna's request for such information. *Gaither*, 388 F.3d at 771. In short, Aetna does not stand in the shoes of a judge, sitting back and taking no investigatory role, waiting for a completed record to be provided by the claimant. *Id.* at 771–74.

■ This is not to say that the Court considers the Plan to require Aetna to "pore over the record for possible bases for disability that the claimant has not explicitly argued, or consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other." *Id.* at 773. Instead, the Court simply holds Aetna to the "narrow principle that it cannot shut its eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiaries' theory of entitlement and when they have little or no evidence in the record to refute that theory." *Id.*

■ It is this very game of hiding the ball that Aetna employed against Boyd in reviewing his claim. The denial letters all focused on whether there was "objective (or documented) proof" of Boyd's "functional incapacity" that would prevent him from performing his job duties as a manager. Even worse for Aetna, some of the in-house medical personnel who reviewed the claim file advised it that more information, such as IMEs or obtaining objective proof, might help Boyd substantiate his claim, but Aetna failed to obtain such proof or provide Boyd the means for doing so. Aetna admitted in discovery that it would accept as "objective proof" of such unanswered question in this case the MHPS form and the Attending Physician Behavioral Health Statement form. Yet at no time before or after discovering that the information elicited by those forms may confirm Boyd's entitlement to LTD benefits did Aetna provide those forms to Boyd. Again the question in the present case is not so much Aetna's failure to ask for information it required before paying out on Boyd's claim, but its failure to submit

forms it had in its possession to Boyd or his doctors that would have elicited the very information they kept insisting they needed from him. Once Aetna communicated to Boyd that it needed objective evidence of his functional restrictions, it should have submitted at the same time its forms to Boyd or his doctors that would have provided that information. Instead, Boyd was left to guess as to what manner the largely overly generalized requests for information from Aetna were supposed to take. It was not Boyd's duty to guess how to present the information to Aetna, especially when Aetna itself had in its hands the means to do so. As Boyd's counsel aptly described the situation confronting his client: "[W]e have a situation where Aetna demands 'objective proof,' ... has the forms which it contends measures 'objective functional capacity,' but fails to tell [Boyd] about the forms and fails to send the forms to [Boyd's] attending physicians for completion. Aetna then denies the claim on the basis that [Boyd] did not submit 'objective proof' of 'functional incapacity.' ... This type of claims administration is reminiscent of the classic 'shell game.'" (Pl's Reply at 3).

Similar procedural irregularity was cited as a basis for finding a serious conflict of interest in *Friedrich v. Intel Corp.*, 181 F.3d 1105 (9th Cir.1999). There the plan administrator did not follow its own internal procedures when it failed to give the claimant all the information and forms it normally provides, and ones which were critical in that case to the claimant having an opportunity to substantiate his entitlement to benefits. *Id.* at 1110. The Court held that such irregularities in the claim administration process warranted a heightened standard of review. *Id.* at 1110. The same is true here.

Nowhere does Aetna dispute that it committed the procedural irregularity noted by Boyd. Instead, the only authority cited by Aetna in opposing Boyd's proof on this point is the Ninth Circuit's decision in *Jordan v. Northrop Grumman Welfare Benefit Plan*, 370 F.3d 869 (9th Cir.2004). That case actually buttresses Boyd's argument rather than undermines it.

In *Jordan*, after receiving reports from the claimant's physicians stating that the claimant suffered from fibromyalgia, the plan administrator wrote directly to them asking for "narrative reports speaking, among other things, to [the claimant's] 'prognosis regarding eventual return to work.'" *Id.* at 873. None of the claimant's physicians responded to the written request, prompting the initial denial of her claim. *Id.* After the claimant filed an appeal, one of her doctors wrote a letter stating that the claimant's condition prevented her from working. At that point, the plan administrator wrote directly to the claimant's physicians asking them to provide "what prevented your patient from performing her occupation," and "what objective findings prevented her from performing sedentary work." *Id.* One doctor responded that the claimant "can't function even sedentary work at present" because of flare-ups from her condition and the intensity of pain the claimant felt. These materials were then forwarded to the plan administrator's in-house physicians to review and comment upon, all of whom disputed the severity of claimant's condition and the methods by which claimant's doctors arrived at their diagnosis of her condition. *Id.* at 874. The plan administrator then forwarded its in-house physicians' reports to claimant's physicians for a response.

The claimant argued that the plan administrator's demand for "objective" proof was arbitrary as "it never gave her adequate notice of what evidence she needed to produce to establish her claim." *Id.* at 881. The Ninth Circuit disagreed. It not-

ed that the plan administrator directly asked claimant's physicians for evidence supporting their opinion that the claimant could not perform her occupation and requested from them objective findings preventing her from doing sedentary work. The doctors, however, never responded to this query. As the court explained:

> [The plan administrator] repeatedly asked [the claimant's] doctors to explain *why* they thought she was disabled. They failed to respond. They gave the administrator nothing but their *ipse dixit* to substantiate the claim. [The plan administrator] had [the claimant's] physicians' records and opinions reviewed by [their in-house physicians] and both disagreed with her doctors. [The plan administrator] gave [the claimant's] physicians [the in-house physicians'] reports so that her physicians could explain why they disagreed. Again, they failed to respond.

*Id.* at 877–78.

None of this took place in this case. The correspondence concerning Aetna's need for objective evidence of Boyd's functional limitations was not sent directly to Boyd's physicians but to Boyd himself. Aetna's in-house physician reports were never sent to Boyd or to Boyd's physicians for their review and comment, but were kept in-house and even then Aetna failed to follow through with the recommendations its physicians made for obtaining an IME or other objective proof that would substantiate Boyd's claim. Making this situation all the more egregious was the fact that, throughout the claim process, Aetna had in hand forms that would satisfy its evidentiary demands but never apprised Boyd of that fact or sent the form to him or his physicians to complete.

Indeed, in *Jordan* the Ninth Circuit dealt with an issue not that different from the current one, but in reverse. There the claimant complained that the plan adminis-

trator never asked for leave slips signed by her treating physician that she had in her possession. The court eschewed her complaint noting that while the claimant "knew of [the leave slips'] existence . . . [the plan administrator] did not," and there was nothing special about the slips themselves "that might impair [the claimant] understanding . . . what they were or why they might bear on her disability claim." *Id.* at 876. The court then went on to hold that when an administrator "asks for documents that the claimant possesses or to which the claimant has equal or superior access," "the claimant does not produce the documents," and "the documents would not have altered the administrator's decision" then no conflict of interest is shown. *Id.* The converse would be true in reverse: If a plan administrator has possession of a document that the claimant does not have equal or superior access to, the administrator does not produce that document, and the document could have altered the administrator's decision, then the failure to produce such documentation is evidence of a serious conflict of interest. This is precisely what took place in this case. Aetna had in its possession forms—forms which Boyd did not have access to—that it could have sent to Boyd's physicians that would have provided Aetna the objective medical evidence regarding Boyd's functional abilities that it so insisted upon during the claim process. Yet Aetna never provided those forms to Boyd's physicians even though it was part of Aetna's custom and practice to do so.

█ ERISA and its implementing regulations require a plan administrator, once it has decided to deny a claim for benefits, to provide the claimant with "adequate notice in writing . . . setting forth the specific reasons for such denial." 29 U.S.C. § 1133(1); *see also* 29 C.F.R. § 2560.503–1(f)(1) & (g)(1). When Boyd made his

claim for long-term disability benefits, Aetna was also required to provide him "[s]pecific reference to the pertinent plan provisions on which the denial is based," and "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503–1(f)(2) & (3). The purpose of ERISA's notice requirement is to provide the claimant "with information necessary for him or her to know what he or she must do to obtain the benefit," and to "enable the [claimant] effectively to protest" if a plan persists in its denial of benefits. *Juliano v. Health Maint. Org. of New Jersey, Inc.,* 221 F.3d 279, 287 (2nd Cir.2000). There must be a "meaningful dialogue between ERISA plan administrators and their beneficiaries." *Booton,* 110 F.3d at 1463. The meaningfulness of the dialogue between the parties in this case became a game of hide the ball with the administrator hiding from Boyd the type of documentation it claims it needed to be able to analyze his claim.

### III. CONCLUSION

Based on the above factual findings and legal standards, the Court concludes that a *de novo* review is the proper legal standard for reviewing Aetna's denial of Boyd's application for long-term disability benefits.